663 A.2d 1289

Steven Clarence HUTTON

v.

STATE of Maryland.

No. 151, Sept. Term, 1993.

Court of Appeals of Maryland.

Aug. 28, 1995.

482

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

BELL, Judge.

We granted certiorari in this case to consider whether expert testimony that the alleged victim of child sexual abuse was suffering from Post Traumatic Stress Disorder (hereinafter, PTSD) [1] as a result of being sexually abused, was admissible to prove that the sexual abuse occurred and whether an expert's testimony that the victim's PTSD is "not in any way faked," was, in effect, a comment on the credibility of the

---

1. PTSD is an anxiety disorder, recognized by the American Psychiatric Association (APA), characterized by four diagnostic criteria:

 A. Existence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone.

 B. Re-experiencing of the trauma as evidenced by at least one of the following:
 (1) recurrent and intrusive recollections of the event
 (2) recurrent dreams of the event
 (3) sudden acting or feeling as if the traumatic event were reoccurring, because of an association with an environmental or ideational stimulus

 C. Numbing of responsiveness to or reduced involvement with the external world, beginning some time after the trauma, as shown by at least one of the following:
 (1) markedly diminished interest in one or more significant activities
 (2) feeling of detachment or estrangement from others
 (3) constricted affect

 D. At least two of the following symptoms that were not present before the trauma:
 (1) hyper alertness or exaggerated startle response
 (2) sleep disturbance
 (3) guilt about surviving when others have not, or about behavior required for survival
 (4) memory impairment or trouble concentrating
 (5) avoidance of activities that arouse recollection of the traumatic event
 (6) intensification of symptoms by exposure to events that symbolize or resemble the traumatic event[.]

 APA, *Diagnostic and Statistical Manual of Mental Disorders,* 236–38 (3rd ed. 1980). *See* Smith, *Post Traumatic Stress Disorder,* 20 Trial 92 (February 1984); *State v. Allewalt,* 308 Md. 89, 100 n. 6, 517 A.2d 741, 757 n. 6 (1986).

victim and, as such, invaded the province of the jury.[2] Stephen Clarence Hutton, the petitioner, was convicted by a jury in the Circuit Court for Prince George's County of two counts each of second degree rape, second degree sexual offense, and child abuse, based, in part, upon such testimony. In an unreported opinion, the Court of Special Appeals affirmed the trial court's allowance of such testimony, holding that *State v. Allewalt*, 308 Md. 89, 517 A.2d 741 (1986) and *Acuna v. State*, 332 Md. 65, 629 A.2d 1233 (1993) were controlling. We now reverse.

The facts relevant to the resolution of this case are not in dispute, the parties having agreed to proceed on an agreed statement of facts, pursuant to Maryland Rule 8–501(g).[3] The petitioner is the victim's stepfather, having married her mother in 1984, when the victim was five years old. At the time of trial, the victim was 14 years old and in the 9th grade.

According to the victim, the sexual abuse consisted of sexual intercourse and fellatio, which was initiated by the petitioner when she was 7 years old, while the family was living in Virginia. It continued, under threat by the petitioner to

---

2. Two other questions were presented by the petition for certiorari—the propriety of the rulings permitting the State to present rebuttal testimony and to question alibi witnesses about their failure to contact the police after learning that the petitioner had been charged. Our resolution of the first issue makes consideration of these issues unnecessary. With respect to the latter, however, in the event of a retrial, we recommend the following cases to the trial judge: *People v. Ratliff*, 189 Cal.App.3d 696, 700–01, 234 Cal.Rptr. 502, 504–05 (2nd Dist.1987); *State v. Bryant*, 202 Conn. 676, 523 A.2d 451, 464–66 (1986); *United States v. Young*, 463 F.2d 934, 938 (D.C.Cir.1972); *People v. Watson*, 94 Ill.App.3d 550, 50 Ill.Dec. 21, 27, 418 N.E.2d 1015, 1021 (1981); *Commonwealth v. Egerton*, 396 Mass. 499, 487 N.E.2d 481, 486–87 (1986); *People v. Fuqua*, 146 Mich.App. 250, 379 N.W.2d 442, 445 (1985); *State v. Silva*, 131 N.J. 438, 621 A.2d 17, 22 (1993); *People v. Dawson*, 50 N.Y.2d 311, 428 N.Y.S.2d 914, 921, n. 4, 406 N.E.2d 771, 777, n. 4 (1980).

3. Maryland Rule 8–501(g) provides, in pertinent part, that "[t]he parties may agree on a statement of undisputed facts that may be included in a record extract or, if the parties agree, as [to] all or part of the statement of facts in the appellant's brief." In this case, the statement of facts is included in the petitioner's brief.

spank her if she told her mother, she said, until she was in the 7th grade, after the family had moved to Prince George's County. The victim testified that, while she was in the 2nd grade, the petitioner would place a scarf over her eyes, put vaseline between her legs and sometimes on his penis and engage in vaginal intercourse with her. During that year, she reported that she told a classmate about the abuse, who in turn told the principal of her school. In the fall of 1990, when she was in the 7th grade, the victim reported that the petitioner had vaginal intercourse with her and made her perform fellatio on him, two or three times a week. This behavior occurred, she said, when she came home from school.

In her testimony, the victim related that on several occasions she told her mother that she was being abused by the petitioner. She stated that she also reported the abuse to her mother on the day that it last occurred and the police were called four days later. She denied having engaged in sexual activity with anyone other than the petitioner or that her vaginal area had been otherwise injured. The victim testified that, starting at the age of four or five, she had frequent vaginal infections, and sometimes it would be necessary for the petitioner or her mother to put vaseline on her.

To corroborate the victim's testimony, the State called, in its case in chief, Gail Jackson, a clinical social worker, whose specialty was working with sexually abused children, and Dr. Nancy Davis, a psychologist with whom Jackson practiced, among others.[4] Although she was found qualified as an expert

---

4. The State also called, in its case in chief, the victim's mother, her pediatrician, and a Fairfax County, Virginia Department of Human Development social worker. Each of them corroborated some aspect of the victim's story.

The victim's mother verified that the victim claimed to have been sexually abused when she was in the 2nd grade, the school principal having called her and related that fact to her. Mrs. Hutton further testified that, while in the fourth grade, the victim also told her that she was being abused. Moreover, Mrs. Hutton confirmed the victim's version of how the present charges came to be brought.

The victim's pediatrician testified that she was told in 1986 that the victim had been abused by her father, that on several occasions her

in behavioral science relative to the therapeutic treatment of children,[5] Jackson was not allowed to offer a diagnosis of, or give an opinion with regard to, PTSD. Instead, she was permitted to enumerate, over the petitioner's objection, the behavioral characteristics of children who have been sexually abused. Having indicated that she had seen at least 600 victims of child sexual abuse in her career, she testified, in particular, that victims of child sexual abuse usually have sleep disorders—disturbances—usually nightmares and "feelings of shame, of guilt, a sense of responsibility." She also characterized them as being prone to anger and being emotionally detached, "being flat in their affect," and having poor relationships. She stated that such children "get very confused about time" and many of them have fears, especially of the alleged perpetrator. Further, Jackson noted that victims of sexual abuse may experience physical ailments, "complaints of headaches, stomach aches in which a lot of it is anxiety." Another characteristic to which Jackson testified was the avoidance of relationships with peers and activity at school. Many times,

father had laid on top of her and put his penis on her private parts. At that time, the pediatrician indicated that the victim had no hymen and she was non-virginal. Her findings, she said, were consistent with the victim's being penetrated by an adult male during an act of sexual intercourse, although she also acknowledged that a torn or absent hymen could be the result of bicycle riding and/or, gymnastics, activities in which the victim acknowledged she engaged, or some other form of exercise in which a child of the victim's age might participate.

The social worker's testimony concerned a conference she had with the petitioner, in the presence of a Fairfax County police officer, to discuss allegations by the victim that she had been sexually abused. According to the social worker, although the petitioner denied any wrongdoing, his explanation was corroborative of the victim's story in several aspects. In particular, the social worker testified that the petitioner acknowledged that he participated in the treatment of the victim's vaginal infections by placing vaseline on her vagina. During one such occasion, he indicated that he put a scarf over the victim's eyes so that she could not learn how to touch herself. On another occasion, the social worker said, the petitioner stated that he had to hold his arm across her body to apply the vaseline.

5. No issue has been raised as to the propriety of a clinical social worker expressing an opinion on this subject. Consequently, we do not address that issue.

according to Jackson, this behavior is indicative of shame. "Either they will be totally withdrawn from someone of the opposite sex or they will be promiscuous." Poor school performance is another characteristic to which Jackson referred—"This stems from the child being preoccupied." Finally, she testified that while many may appear to be somewhat aloof and detached from their feelings, "many of them are hyper vigilant, which means that they are startled very easily. Always on guard, taking in their whole surrounding because they had to be on guard."

Jackson was then allowed to relate the behavioral characteristics she identified as common to child sexual abuse victims to her client, the victim in this case, whom she had seen in one-hour sessions approximately 30 to 35 times during a period of a little more than a year. In that regard, Jackson testified that the victim was very depressed, withdrawn, fearful, and sad. In addition, she had a lot of guilt and was "emotionally very detached." She had, Jackson reported, a "significant number of nightmares. Dreaming of someone chasing her, not being able to see their face and that is very, very common among victims I have worked with of all ages." The victim, according to Jackson, exhibited "a lot of ambivalence" toward her stepfather and was quite confused. Moreover, she had poor grades and was having difficulty getting along with the other children at school and, Jackson added, she was afraid of men.

Jackson conceded, on cross-examination, that these characteristics were consistent not only with sexual abuse but with the existence of other kinds of "stress disorders," as well. She also admitted that, in the therapeutic setting, the "credibility of the person [who is] talking to you is probably of the utmost importance ... that is whether the person is telling a lie or has a reason to be in there making up a story, something like that[.]" Thereupon, on redirect examination, the State inquired into how Jackson assessed the credibility of alleged victims of sexual abuse:

Q. How is it that you as [the victim's] therapist assess not with regard to her but in any case how do you assess credibility? How can you tell malingering?

A. The consistency for which they give me the basic information. An individual who is able to consistently give me that something happened, I don't so much look for times as I look for the consistency with what happened and over time there is that consistency. I believe that that particular individual is telling me the truth.

Dr. Davis was called as an expert in clinical psychology with a specialty in child sexual abuse. Dr. Davis did no psychological testing of the victim. Her conclusions were reached on the basis of having spoken to the victim when she came into the office to see Ms. Jackson, having reviewed Ms. Jackson's notes and records and the medical report from the Prince George's Sexual Assault Center, and having discussed the case with Ms. Jackson. She opined, over the petitioner's objection,[6] that the victim was suffering from PTSD. In support of that diagnosis, she explained what PTSD is, during the course of which she further opined that the traumatic event triggering the disorder was child sexual abuse.

Dr. Davis' description of PTSD is consistent with that contained in APA, *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed. 1980). Among the symptomology she identified were the following:

1) "a severely traumatic event ... outside the range of normal human experience that anybody would find to be

---

6. The petitioner asked for, and received, a continuing objection as to all of the PTSD testimony and, in particular, "as to the relevance of psychiatric testimony." *See* Maryland Rule 4–323(b), which provides:

> (b) *Continuing objections to evidence.*—At the request of a party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to the questions clearly within its scope.

Although there was no objection precisely at the moment that the opinion was rendered, the question calling for the witness' opinion was clearly within the scope of the continuing objection.

traumatic, and these include a wide variety of things, but very severe trauma, [like] [s]eeing somebody murdered;"

2) "re-experienc[ing] this event in their mind," often in dreams;

3) numbing oneself to one's feelings; displaying a flat affect; "they look almost like a robot when you talk to them;"

4) "increased arousal"—characterized "by problems such as sleep, problems staying asleep, problems concentrating, problems in school learning, and being very startled when you walk up on them . . .;"

5) the symptoms must last over a month.

Dr. Davis noted the following symptoms she observed in the victim: a flat affect—"there was no expression on her face and no feeling in her voice;" the victim was ambivalent toward her mother and the petitioner; the victim felt responsible for what happened; the victim had poor grades, and problems getting along with other children at school; and the victim had sleep problems. With respect to the conclusion that the traumatic event triggering the disorder was child sexual abuse, Dr. Davis pointed to the consistency in the victim's story, stating: "She's been extremely consistent in her story from age five on, despite the fact that numerous people have tried to knock holes in her story by asking her again and again. She's been consistent in what she said, and that is another thing that I look for. . . . She's told a variety of people, she's told principals, she's told counselors. She's told all kinds of people. . . ." Dr. Davis also mentioned the medical evidence—the lack of a hymen, the fact "that she is enlarged." Like Jackson, except that it was in the State's case in chief, Dr. Davis was asked about credibility evaluation. In response to the question, "Dr. Davis, a lot of what you've been diagnosing . . . assumes one thing, that she is being truthful with you and Dr.—and Miss Jackson, how do you—how do you detect malingering? How do you assess credibility? What is your personal method?", Dr. Davis, in part, noted:

[t]hey [child victims] don't understand the dynamics of sexual abuse that this is the way certain things happened,

and they tell it like an outsider might think this is the way abuse might happen. And I look for the consequences, the post-traumatic stress or whatever which with her, in my opinion, is not in any way faked. She couldn't fake this level for this time or such severe withdrawal and shutting down of herself.

The petitioner, testifying in his own defense, denied ever having sexually abused his stepdaughter.[7] In addition, the petitioner called three alibi witnesses who testified that the defendant was at work during the time when the last alleged act of abuse occurred and, so, could not have committed it.[8]

The petitioner challenges the admissibility of expert testimony that his stepdaughter suffered from PTSD caused by her being sexually abused, the symptoms of which were "not in any way faked." He argues that the reliability of PTSD as evidence to prove the underlying stressor, in this case, child sexual abuse, (1) has not been established, (2) that its probative value is outweighed by its potential unfairly to prejudice and mislead the jury, and (3) that allowing an expert to testify as to the cause of PTSD is a comment on the victim's credibility and, thus, invades the province of the jury. If PTSD testimony is admissible at all, the petitioner asserts, it is only for the limited purpose of rehabilitating the victim's testimony by explaining aspects of the victim's post incident behavior attacked by the defendant as being inconsistent with that of a person who has been sexually abused.

---

**7.** It was because the petitioner also denied having participated in the treatment of his stepdaughter's vaginal infections, or having told the Fairfax County social worker that he did, as well as his denial of having said the things attributed to him by the social worker, that prompted the court to permit, on rebuttal, the testimony of the Fairfax County police officer. It was this testimony out of which the second issue arose.

**8.** It was during the cross-examination of the three defense alibi witnesses that the third issue arose, i.e., whether a foundation is necessary prior to questioning an alibi witness as to why he or she did not contact the police after becoming aware of the defendant's arrest.

The State, urging affirmance of the judgments under review, maintains that PTSD evidence was properly admitted, in its case in chief, to prove that the sexual abuse charged actually occurred. It denies that the expert testimony in this case in any way infringed upon the jury's function of ultimately determining the credibility of the witnesses.

PTSD may be experienced by persons who have been in combat, natural disasters, automobile or airplane accidents, or raped, among other traumatic events. *Smith, Post Traumatic Stress Disorder,* 20 Trial 92 (February 1984). Thus, there is no particular stressor that triggers PTSD; it can be caused by any number of stressful experiences. The symptoms characteristic of PTSD may become apparent shortly after the traumatic event or they may not appear until several months, or even years later. APA, *supra* at 237. Moreover, determining from the symptoms that PTSD is the proper diagnosis ordinarily does not answer the question of what traumatic event caused it; the symptoms, in other words, are not reliable identifiers of the specific cause of the disorder.

PTSD is sometimes defined in terms of the stressor which caused it. Accordingly, when the stressor is rape, the term "rape trauma syndrome" (hereinafter, RTS) is sometimes used. *See* Burgess & Holmstrom, *Rape Trauma Syndrome,* 131 Am.J.Psychiatry 981 (September 1974); *State v. Alberico,* 116 N.M. 156, 861 P.2d 192, 195 (1993). *But see Alphonso v. Charity Hosp. of Louisiana,* 413 So.2d 982, 986 (La.Ct.App. 4th Cir.), *cert. denied,* 415 So.2d 952 (La.1982), treating PTSD and RTS as being separate and distinct. On the other hand, in addition to triggering PTSD, the traumatic event may be the causative factor for a related, but different disorder. Child sexual abuse, a recognized stressor causing PTSD, may also be the triggering event for child sexual abuse accommodation syndrome (hereinafter, CSAAS). *See* Roland C. Summit, *The Child Sexual Abuse Accommodation Syndrome,* 7 Child Abuse & Neglect 177 (1983). For diagnostic purposes, characteristics commonly observed in sexually abused children, different from and in addition to those normally associated with PTSD, come into play. They are: (1) secrecy, (2) helpless-

ness, (3) entrapment and accommodation, (4) delayed, conflicted, and unconvincing disclosure, and (5) retraction. Notwithstanding that CSAAS is not simply a refinement of PTSD on the basis of its cause, because when the traumatic event is child sexual abuse, they share a common cause, the approach to discovering that cause is analytically the same. And, because a diagnosis of PTSD is certainly more general than a diagnosis of CSAAS, the reliability of expert PTSD testimony on causation can be no greater than that concerning CSAAS.[9]

The literature on the subject discusses PTSD and related disorders and syndromes in the context of treating victims of a traumatic experience. *See, e.g.,* Woodling & Kossoris, *Sexual Misuse: Rape, Molestation, and Incest,* 28 Pediatric Clinics N.Am. 489, 489–90 (1981); Burgess & Holmstrom, *Rape: Victims of Crisis,* 47–50 (1974); Comment, *The Psychologist's Expert Witness: Science in the Courtroom?,* 38 Md.L.Rev. 539, 580 n. 207 (1979). The literature concludes that a PTSD diagnosis is essentially a therapeutic aid, rather than a tool for the detection of sexual abuse, *see State v. J.Q.,* 130 N.J. 554, 617 A.2d 1196, 1203–05 (1993); *People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 459, 681 P.2d 291, 300 (1984); John E.B. Myers, *Expert Testimony in Child Sexual Abuse Litigation,* 68 Neb.L.Rev. 1, 67–68 (1989); Comment, *The Psychologist as Expert Witness: Science in the Courtroom?, supra* at 580 n. 207 (Stating that the purpose of codifying the diagnostic criteria for PTSD is to "standardiz[e] the classification system with reference to empirically demonstrable phenomenon, thus enhancing the communication and research between mental health professionals."), since such a diagnosis assumes the presence of abuse and explains the victim's reactions to it. *See In re Sara M,* 194 Cal.App.3d 585, 593, 239 Cal.Rptr. 605,

---

**9.** Our use of the terms "Rape Trauma Syndrome" and "Child Sexual Abuse Accommodation Syndrome" in our discussion is not intended to endorse their use by experts testifying in criminal trials, where the charged offense is rape or child abuse, sexual or physical. The use of such terms may themselves be prejudicial. We recognized that possibility in *Allewalt,* 308 Md. at 108, 517 A.2d at 750, just as other courts have done. *See, e.g., State v. Roles,* 122 Idaho 138, 832 P.2d 311, 318 n. 4 (App.1992); *State v. Gettier,* 438 N.W.2d 1, 6 (Iowa 1989).

610 (1987); *Lantrip v. Commonwealth,* 713 S.W.2d 816, 817 (Ky.1986).

Because causes other than sexual abuse may trigger PTSD—the traumatic event being unable to be verified objectively, its occurrence must necessarily be assumed—a diagnosis of PTSD does not reliably prove the nature of the stressor. This result is to be contrasted with Battered Child Syndrome (hereinafter, BCS). In making that diagnosis, one reasons from the type of injury to the cause of the injury; thus, it is probative of physical abuse. *See* Case Note, *Expert Medical Testimony Concerning "Battered Child Syndrome" Held Admissible,* 42 Fordham L.Rev. 935, 935 (1974) (medical testimony on BCS is admissible as circumstantial proof that the child's injuries were not accidental).

Of the many jurisdictions that have considered this issue, most have analyzed the admissibility of PTSD evidence on at least one, and most often all, of the three grounds raised by the petitioner.

To be sure, some of them adopt completely the State's position, *see, e.g., Glendening v. State,* 536 So.2d 212 (Fla. 1988); *Kruse v. State,* 483 So.2d 1383 (Fla.Dist.Ct.App.1986); *State v. Reser,* 244 Kan. 306, 767 P.2d 1277 (1989); *State v. Myers,* 359 N.W.2d 604 (Minn.1984); *State v. Liddell,* 211 Mont. 180, 685 P.2d 918 (1984); *State v. Bachman,* 446 N.W.2d 271 (S.D.1989); *State v. Edward Charles L.,* 183 W.Va. 641, 398 S.E.2d 123 (1990), even when the expert may have offered an opinion as to the credibility of the victim. *E.g., Kruse,* 483 So.2d at 1387. While some have held such testimony inadmissible for any purpose, *see, e.g., Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830, 836–37 (1992); *State v. Myers,* 382 N.W.2d 91, 97 (Iowa 1986), the majority, for a variety of reasons, agree with the petitioner's arguments.

■ As to the petitioner's first contention, some courts have found the evidence scientifically reliable, *see, e.g., State v. Marks,* 231 Kan. 645, 647 P.2d 1292, 1299 (1982) ("An examination of the [scientific] literature clearly demonstrates that the so-called 'rape trauma syndrome' is generally accepted to

be a common reaction to sexual assault."); *Liddell,* 685 P.2d at 923 (Although rape trauma syndrome is a relatively new psychiatric development "the presence of rape trauma syndrome is detectable and reliable as evidence that a forcible assault did take place.") (quoting *Marks); State v. Huey,* 145 Ariz. 59, 699 P.2d 1290, 1294 (1985) (rape trauma syndrome is "generally accepted") (quoting *Marks*).[10] These courts admitted PTSD testimony when the defense was consent. Other cases hold that the reliability of expert PTSD testimony to prove child sexual abuse or rape has not yet been established, and, hence, is inadmissible. *See Spencer v. General Electric Co.,* 688 F.Supp. 1072, 1073 (E.D.Va.1988); *People v. Bledsoe,* 203 Cal.Rptr. at 460, 681 P.2d at 301 (rape trauma syndrome is not relied upon in the scientific community to prove that a rape occurred); *State v. Batangan,* 71 Haw. 552, 799 P.2d 48,

---

10. This Court has adopted the standard of admissibility for scientific evidence expert testimony announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). *See Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). Under the *Frye–Reed* standard, in order to be admissible, a court must determine that a scientific process or technique is generally accepted within the relevant scientific community. *See Frye,* 293 F. at 1014, *Reed,* 283 Md. at 381, 391 A.2d at 367. Recently, however, in *Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court reviewed the *Frye* standard "in light of sharp divisions among the courts regarding the proper standard for the admission of expert testimony." *Id.* at ——, 113 S.Ct. at 2792, 125 L.Ed.2d at 478. It held that the adoption by Congress of Federal Rule of Evidence 702 has modified the *Frye* standard, reasoning:

Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention "general acceptance," the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from and incompatible with the Federal Rules of Evidence, should not be applied in federal trials.

*Daubert,* at ——, 113 S.Ct. at 2794, 125 L.Ed.2d at 480.

On July 1, 1994, this Court adopted Maryland Rules of Evidence patterned after the federal rules. Our counterpart to Federal Rule of Evidence 702 is Md.R.Evid. 5–702. As a committee note makes clear, however, the adoption of the Rule "is not intended to overrule *Reed* ... and other cases adopting the principles enunciated in *Frye....* The required scientific foundation for the admission of novel scientific techniques or principles is left to development through case law."

51 (1990); *Lantrip v. Commonwealth,* 713 S.W.2d at 817; *State v. Foret,* 628 So.2d 1116, 1127 (La.1993) (CSAAS evidence is of highly questionable scientific validity and fails to pass threshold test of scientific reliability); *State v. Black,* 537 A.2d 1154, 1156–57 (Me.1988); *People v. Beckley,* 434 Mich. 691, 456 N.W.2d 391, 404–08 (1990); *State v. Saldana,* 324 N.W.2d 227, 229 (Minn.1982) ("Rape trauma is not the type of scientific test that accurately and reliably determines whether a rape has occurred"); *State v. Taylor,* 663 S.W.2d 235, 240 (Mo.1984) ("Dr. Amanat's statements that the prosecutrix suffered from rape trauma syndrome and that she had been raped are not sufficiently based on a scientific technique"); *State v. Cressey,* 137 N.H. 402, 628 A.2d 696, 699–702 (1993) (expert's testimony regarding effects of sexual abuse on children not sufficiently reliable to be admitted as evidence that victims were sexually abused); *State v. J.Q.,* 617 A.2d at 1209 (CSAAS not shown to be generally accepted as scientific indicator of the substantive fact of abuse); *People v. Taylor,* 75 N.Y.2d 277, 552 N.Y.S.2d 883, 890, 552 N.E.2d 131, 138 (1990); ("Although we have accepted that rape produces identifiable symptoms in rape victims, we do not believe that evidence of the presence, or indeed of the absence, of those symptoms necessarily indicates that the incident did or did not occur"); *State v. Hall,* 330 N.C. 808, 412 S.E.2d 883, 890 (1992); (noting that evidence of PTSD "does not alone prove that sexual abuse has in fact occurred"); *Commonwealth v. Dunkle,* 602 A.2d at 832–36; *State v. Hudnall,* 293 S.C. 97, 359 S.E.2d 59, 61–62 (1987); *Frenzel v. State,* 849 P.2d 741, 749 (Wyo.1993) (CSAAS evidence has not reached the stage of development to make it, alone, a reliable indicator of sexual abuse). *See also* John E.B. Myers, *supra* at 19–32.

That impediment does not exist when the PTSD testimony is offered in a civil action only to prove damages. *See Spencer v. General Electric Co.,* 688 F.Supp. at 1077–78; *Redmond v. Baxley,* 475 F.Supp. 1111, 1121–22 (E.D.Mich.1979); *Division of Corrections v. Wynn,* 438 So.2d 446, 448 (Fla.Dist.Ct.App. 1983); *Alphonso v. Charity Hospital,* 413 So.2d 982, 986–87 (La.Ct.App.1982); *White v. Violent Crimes Compensation*

*Board,* 76 N.J. 368, 388 A.2d 206, 216 (N.J.1978); *Skaria v. State,* 110 Misc.2d 711, 442 N.Y.S.2d 838, 841–42 (N.Y.Ct.Cl. 1981); *Wesley v. Greyhound Lines, Inc.,* 47 N.C.App. 680, 268 S.E.2d 855, 860–61 (1980). Nor does it exist when the occurrence of the precipitating traumatic event has been conceded, has not been challenged, or has been established.

Courts that find the PTSD testimony scientifically unreliable also exclude the evidence as unduly prejudicial. *Saldana,* 324 N.W.2d at 229–30; *State v. McQuillen,* 236 Kan. 161, 169–70, 689 P.2d 822, 828 (1984). *See also Spencer v. General Electric Co.,* 688 F.Supp. at 1076.

Still other cases, some without addressing whether it is admissible to establish the fact of abuse, have held that PTSD evidence is admissible as rebuttal evidence to refute defense contentions that the victim's behavior is inconsistent with that of a person who has been sexually abused or raped. *State v. Moran,* 151 Ariz. 378, 728 P.2d 248, 254 (1986); *State v. Huey,* 699 P.2d at 1294; *Bledsoe,* 203 Cal.Rptr. at 457, 681 P.2d at 298; *People v. Fasy,* 829 P.2d 1314, 1317 (Colo.1992); *State v. Spigarolo,* 210 Conn. 359, 556 A.2d 112, 123 (1989); *Wheat v. State,* 527 A.2d 269, 273–74 (Del.1987); *Batangan,* 799 P.2d at 52; *Commonwealth v. Mamay,* 407 Mass. 412, 553 N.E.2d 945, 951 (1990); *Beckley,* 456 N.W.2d at 405; *Cressey,* 628 A.2d at 703; *J.Q.,* 617 A.2d at 1201; *Alberico,* 861 P.2d at 210; *Taylor,* 552 N.Y.S.2d at 890, 552 N.E.2d at 138; *Townsend v. State,* 103 Nev. 113, 734 P.2d 705, 708 (1987); *Hall,* 412 S.E.2d at 890; *State v. Middleton,* 294 Or. 427, 657 P.2d 1215, 1221 (1983); *State v. Jensen,* 147 Wis.2d 240, 432 N.W.2d 913, 923 (1988).

Where, however, PTSD expert testimony also addresses the credibility of the victim, it has been held inadmissible because it invaded the province of the jury. *Moran,* 728 P.2d at 254–56; *Wheat,* 527 A.2d at 274–75 (expert testimony which "in effect provided a statistical evaluation of the complainant's present veracity ... impermissibly invaded the credibility province of the trier of fact...."); *Taylor,* 663 S.W.2d at 241 ("Clearly, the psychiatrist's specific statement that the victim did not fantasize the rape was an express opinion about her

credibility, and his entire testimony that the victim suffered from rape trauma syndrome carried with it an implied opinion that the victim had told the truth in describing the rape. Further, the psychiatrist's testimony that he was specifically trained to evaluate verbal and nonverbal responses lends a special reliability to his opinion of the victim's credibility"); *Townsend,* 734 P.2d at 708 ("[E]xpert testified, in effect, that the child's testimony was true"); *Alberico,* 861 P.2d at 210–11 (holding PTSD testimony inadmissible as to credibility to prove identity of the perpetrator, or as to causality); *State v. Chul Yun Kim,* 318 N.C. 614, 350 S.E.2d 347, 350–51 (1986) (testimony that the victim has "never been untruthful with me about it. Everything that she had to say to me somehow I'd find out later that she was telling the truth" was improper expert testimony to establish the victim's credibility as a witness); *State v. Milbradt,* 305 Or. 621, 756 P.2d 620, 622–24 (1988) (where the issue is credibility, permitting a psychotherapist to testify concerning whether he or she observed evidence of deception improperly infringes upon the jury's province to assess credibility); *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920, 922 (1986) (expert testimony as to the credibility of children similar in age to the victim is an encroachment upon the province of the jury to decide issues of credibility). *See also Spencer v. General Electric Co.,* 688 F.Supp. at 1078.

This Court has considered the admissibility of PTSD testimony on two occasions. *See Acuna v. State, supra,* and *State v. Allewalt, supra.* The former case, like the case *sub judice,* involved a child victim. Similarly, the expert testimony concerning PTSD was offered in the State's case in chief, presumably, to corroborate State's evidence that the abuse occurred. The trial court did not allow the expert to relate the victim's behavior to that of other victims of child abuse—*i.e.* she was not permitted to testify that the victim's behavior was consistent with that of other victims of child abuse. Nor did the expert testify that the victim had been sexually abused. What the trial court permitted the expert to do was to define PTSD, enumerate the symptoms of that disorder which she observed

in the victim, opine that those behaviors were consistent with the existence of PTSD, and testify that the victim's in court behavior was consistent with the behavior she displayed during evaluation. Urging that the expert PTSD testimony "is 'evidentially meaningless' unless the symptoms of PTSD 'were either actually or inferentially connected to the sexual offenses on which [Acuna] was standing trial,'" the defendant argued that the expert's testimony was irrelevant. Relying on *Allewalt*, this Court concluded that there was no error "since the expert was able, through history, to connect the PTSD to the criminal conduct charged." *Acuna*, 332 Md. at 71, 629 A.2d at 1233.

The victim of the rape, which was at issue in *Allewalt*, was an adult. The defendant did not deny that intercourse had occurred; rather, he contended that the victim consented. To refute that defense, the State called, in its rebuttal case, a psychiatrist who testified that his examination of the victim led him to conclude that she suffered from PTSD. He went on to opine, based on the history given him by the victim, that the precipitating cause of the PTSD was the rape alleged by the victim. The Court held that the expert's opinion was properly admitted. To reach that conclusion, we equated the admissibility of the PTSD diagnosis and the expert's opinion concerning its precipitating cause with the admissibility, in personal injury cases, of a diagnosis and expert opinion on causation, based on history. *Allewalt*, 308 Md. at 98–99, 517 A.2d at 745–46. Relying on *Beahm v. Shortall*, 279 Md. 321, 368 A.2d 1005 (1977), the Court stated:

> Dr. Spodak's opinion that the PTSD which he diagnosed ... was caused by the rape which she described is as evidentiarily reliable as an opinion by an orthopedist who has been engaged only to testify ascribing a plaintiff's subjective complaints of low back pain to soft tissue injury resulting from an automobile accident described in the history given by the plaintiff.

*Id.* The Court also pointed out that the expert did not purport to be able to identify the cause of the PTSD based only on the observed symptoms, but depended on the patient's

history. It concluded that there was neither impermissible prejudice nor an attempt to certify the victim's credibility. Significantly, the record reflects that the expert was asked to assume the victim's truthfulness and, upon that basis give an opinion as to whether she suffered from PTSD and, subsequently, that he was asked, not " 'whether or not it occurred, but based on what she told you, what would be the trauma that forms the basis for your opinion?' " The expert was not asked, in other words, to opine as to the occurrence of the precipitating trauma.

The issue presented in *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988), a case decided after *Allewalt,* was the propriety of the admission into evidence of an expert opinion that a child under the age of 14 was the victim of sexual abuse. In that case, the critical issue was credibility. Rather than eyewitnesses or physical evidence to corroborate the victim, there was only testimony tending to impeach the victim from a motivational standpoint and substantively. Thus, the outcome of the case depended solely upon whom the jury chose to believe. We held, on alternative grounds, that expert testimony that the victim had been abused was improperly allowed.

The first ground related to the adequacy of the foundation for the expert opinion. We observed, in that regard, that it was woefully inadequate:

The record leads to no other conclusion than that Temple's opinion was founded only upon what Alicia said had occurred. As far as can be gleaned from the record, the source of all the evidence concerning the incidents was the child—what she told Temple, what the mother said the child told her, what the mother's friend said the child told her. Temple proffered no evidence as to objective tests or medically recognized syndromes with respect to the child. Nor did Temple present any evidence as to the child's behavior compared to general behavioral characteristics of child abuse victims. There was no physical evidence on which to base the opinion. There were no eyewitnesses. The opinion was reached on the child's unsubstantiated averments and "a certain sense about children" which Temple believed

she possessed. Temple's intuitive reaction to the child's story did not suffice to provide a foundation for the opinion that the child was, in fact, sexually abused. The opinion of Temple was not based on facts sufficient to form a basis for her opinion. There were no facts to show that Alicia's allegations were true, so that a reasonably accurate conclusion that the child had been sexually abused could be made. The conclusion that she had in fact been abused was no more than mere conjecture or guess. The short of it is that the very groundwork for Temple's opinion was inadequately supported.

*Id.* at 276, 539 A.2d at 662. We concluded, therefore, that the trial court abused its discretion in admitting the expert testimony.

The alternative reason for the holding was that the expert's opinion was inadmissible as a matter of law. We first noted the fundamental principles that it is the jury that decides the credibility and assesses the weight to be accorded to the testimony, *id.* at 277, 539 A.2d at 662, citing *Battle v. State,* 287 Md. 675, 685, 414 A.2d 1266, 1271 (1980), and that the office of expert testimony is not to resolve conflicting evidence, otherwise it would infringe on the province of the jury. *Id.* at 278, 539 A.2d at 663, citing *Stebbing v. State,* 299 Md. 331, 349, 473 A.2d 903, 911 (1984) and *Kruszewski v. Holz,* 265 Md. 434, 445, 290 A.2d 534, 540 (1972), citing, *Calder v. Levi,* 168 Md. 260, 266, 177 A. 392, 394 (1935). We then concluded:

The opinion of Temple that Alicia in fact was sexually abused was tantamount to a declaration by her that the child was telling the truth and that Bohnert was lying. In the circumstances here, the opinion could only be reached if the child's testimony were believed and Bohnert's testimony disbelieved. The import of the opinion was clear—Alicia was credible and Bohnert was not. Also, the opinion could only be reached by a resolution of contested facts—Alicia's allegations and Bohnert's denials. Thus, the opinion was inadmissible as a matter of law because it invaded the province of the jury in two ways. It encroached on the jury's function to judge the credibility of the witnesses and

weigh their testimony and on the jury's function to resolve contested facts. Inasmuch as the opinion was inadmissible as a matter of law, it was beyond the range of an exercise of discretion.

*Id.* at 278–79, 539 A.2d at 663.

The case *sub judice* has elements reminiscent of all three of the aforementioned cases. It is not, however, identical to any one of them. Like *Acuna*, it involves a minor victim and expert testimony on PTSD, introduced in the State's case in chief, to prove that the sexual abuse with which the defendant was charged actually occurred. Unlike *Acuna*, the expert opinion in this case went beyond explaining the characteristic elements of PTSD and relating the victim's behavior to them; by being permitted to identify the sexual "stressor" and to testify that those behaviors on the part of the victim were not faked, the expert was enabled to opine that the victim's claimed sexual abuse did in fact occur, thus vouching for the victim's credibility. Moreover, unlike the defendant in *Acuna*, the petitioner in this case challenged not simply the general relevance of PTSD testimony, but argued that it was inadmissible for the purpose for which it was offered.

Like *Allewalt*, the expert witness was permitted to offer an opinion as to the traumatic event precipitating the PTSD, relying on the victim's history as related to her by the victim and others. Unlike *Allewalt*, in which the critical event, *i.e.,* sexual intercourse, was conceded, in the case *sub judice*, the petitioner unequivocally denied any sexual contact with the victim. Moreover, unlike *Allewalt*, the expert testimony was offered to prove the abuse, rather, than to rebut a contention that it never occurred. Thus, like *Bohnert*, the critical issue in this case is credibility and also, like in *Bohnert*, the expert indicated that she believed the victim. Unlike in *Bohnert*, however, there was evidence from a pediatrician that physical examination of the victim uncovered findings consistent with the victim having been sexually abused, although that need not have been the cause.

■ In a criminal case charging child sexual abuse, the gravamen of the State's case is proof of the abuse. Thus, it is the trier of fact that must determine that the sexual abuse occurred. That responsibility does not change simply because the State seeks to prove the abuse by proving that the victim suffers from PTSD. In that case, the sexual abuse, in addition to being the critical element in the State's case against the defendant, is also the stressor which precipitates PTSD. Where PTSD is involved, the jury's responsibility to determine whether the abuse occurred involves making the connection between the existence of symptoms consistent with PTSD and the stressor, here child sexual abuse, that is alleged by the State to have caused the victim to suffer from PTSD.

As we have seen, PTSD, rather than being caused by a particular event or experience, may be caused by any one of a number of events or experiences. All that is required is that the event or experience be severely traumatic. Indeed, a PTSD diagnosis necessarily assumes that there has been a traumatic experience which precipitated it. Consequently, unless identification of the specific stressor is a necessary part of the diagnosis, it would seem that expert testimony on that aspect of the diagnosis would be unnecessary, that the precipitating traumatic experience need not be defined precisely. Expert testimony that a particular event *could* have caused the disorder ordinarily would provide the requisite connection. But identification of the specific precipitating cause of the PTSD is necessary to the diagnosis. The diagnostic criteria, discussed in footnote one, are stressor specific. It is the precipitating trauma that must be re-experienced. Criteria B. The numbing of responsiveness is also related to the precipitating trauma, criteria C, as are at least two of the symptoms in criteria D. Thus, in order for an expert to make a diagnosis of PTSD, generally he or she must know what the recognized stressor is.

■ Where the stressor cannot be objectively determined, its existence depends upon the credibility of the PTSD

sufferer, and thus, expert testimony that the stressor alleged by the sufferer, in fact, caused the PTSD may be inappropriate for several reasons. First, since, in that event, the source will be the PTSD sufferer, to be able to identify a particular stressor as the precipitating cause of PTSD, as opposed to determining that it could be the precipitating cause, requires the expert to believe that the PTSD sufferer has experienced the traumatic experience related; he or she, in other words, must believe the PTSD sufferer. Second, because such a diagnosis implicates the credibility of the victim, allowing the expert to identify the traumatic event precipitating the PTSD runs a great risk in a jury trial that the jury's function will be usurped, *i.e.* the jury will give the expert opinion too great weight and not realize it is solely dependent on the veracity of the patient. *See State v. Taylor,* 663 S.W.2d at 24. Finally, permitting an expert to determine whether a particular stressor is the causative factor in a particular case may require the expert to engage in credibility assessment, a matter outside his or her area of expertise and one historically and appropriately entrusted to the jury. In any event, it is certain that, no matter how learned in his or her field of expertise, no expert is in a better position to assess the credibility of a witness than is the jury. *See* Terr, *The Child As Witness,* Child Psychiatry in the Law, 207, 216 (D. Schetky & E. Benedek ed. 1980) ("lying is not easily detectable by some psychiatrists."); Rosenfeld, Nadelson & Krieger, *Fantasy & Reality in Patients' Reports Of Incest,* 40 J. of Clinical Psychiatry 162 (1979) (A clinician "may still be left questioning whether the reported events are reality."); Summitt, *supra* at 179, 182 (a behavioral scientist notes that "a nagging uncertainty exists" regarding their ability to distinguish between fantasy and reality). *See also* David McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecution: A Foray into the Admissibility of Novel Psychological Evidence,* 77 N.W. Journal of Criminal Law & Criminology 1, 42–43 (1986). Indeed, the veracity of a witness is not beyond the understanding of a juror. *See People v. Sergill,* 138

Cal.App.3d 34, 39, 187 Cal.Rptr. 497, 500 (1982).[11]

For the foregoing reasons, we hold that the admission of PTSD testimony to prove sexual abuse occurred was inadmissible and clearly error. Testimony by an expert that the alleged victim suffered from PTSD as a result of sexual abuse goes beyond the limits of proper expert expression. Expert testimony describing PTSD or rape trauma syndrome may be admissible, however, when offered for purposes other than simply to establish that the offense occurred. The evidence might be offered, for example, to show lack of consent or to explain behavior that might be viewed as inconsistent with the happening of the event, such as a delay in reporting or recantation by the child. *See Taylor*, 552 N.Y.S.2d at 888–90, 552 N.E. at 136–38. This case does not fit within any such exception.

In the case at bar, both experts commented, impermissibly, we hold, on the victim's credibility and Dr. Davis opined,

---

**11.** In a motion *in limine*, counsel for the petitioner argued that Dr. Davis' testimony was irrelevant. The trial court reserved its ruling. At trial, however, the trial court allowed the testimony, stating:

> Okay. The record should reflect that pursuant to Courts & Judicial Proceedings Article Title 9—I forgot, its 9 something 6, that psychiatrists may render an opinion. Give an ultimate opinion in the case, so its a different posture than that statute.
>
> \* \* \* \* \* \*
>
> But I ruled that I am going to allow it, and I even said for the Court of Special Appeals she can render an ultimate opinion.

The provision to which the trial court referred was undoubtedly Maryland Code (1974, 1989 Repl.Vol.) § 9–120 of the Courts & Jud.Proc.Article, which provides:

> Notwithstanding any other provision of law, a psychologist licensed under the "Maryland Psychologists Act" and qualified as an expert witness may testify on ultimate issues, including insanity, competency to stand trial, and matters within the scope of that psychologist's special knowledge, in any case in any court or in any administrative hearing.

The credibility of a witness, however, is not an ultimate issue. *See Yount v. State*, 99 Md.App. 207, 215, 636 A.2d 50, 51, *cert. denied*, 335 Md. 82, 642 A.2d 193 (1994) ("A witness's credibility cannot directly either convict or acquit. The issue of credibility is simply not the ultimate issue. It is not even a component part or an element of the ultimate issue.")

again, we think, impermissibly, that the victim had been sexually abused. Although not permitted to make a diagnosis or give an opinion as to PTSD, Ms. Jackson testified as an expert in behavioral science as it relates to the treatment of children, to the behavioral characteristics of child sexual abuse victims and was permitted to attribute those characteristics to the victim in this case as well as indicate her opinion of the victim's consistency and, indirectly, her truthfulness. Dr. Davis's testimony was to like effect, except that its focus was more clearly related to PTSD. She was allowed to express her opinion that the victim suffered from PTSD, the characteristics of which she explained to the jury. She also was permitted to testify that the precipitating traumatic experience was child sexual abuse. The primary sources of that information was, of course, the victim. Moreover, both Jackson and Davis were questioned by the prosecutor with respect to how they detected malingering, how they judged credibility. Both referred to the consistency in the victim's story as an important indication of "non-malingering." But Dr. Davis went further, for in direct response to the prosecutor's question calling for her "personal method" of assessing credibility, she asserted that the victim's symptoms were not "in any way faked. She couldn't fake this level at this time or such severe withdrawal and shutting down of herself." In expressing an opinion as to PTSD, Dr. Davis, to an even greater extent than Ms. Jackson, necessarily stated her opinion on the victim's credibility. Such an opinion is outside her area of expertise and, indeed, invaded the province of the jury. Thus, as in *Bohnert*, both Dr. Davis's and Ms. Jackson's opinion evidence was inadmissible, and it was error for the trial court to have allowed it.

 *Allewalt* falls within that line of cases, on which that Court specifically relied, that holds that PTSD testimony is admissible where the defense is that the victim consented to sexual intercourse. *See Marks*, 647 P.2d at 1297; *Liddell*, 685 P.2d at 923; *Huey*, 699 P.2d at 1294. The Court was aware of, and concerned about, the potential for unfair prejudice which might result from allowing PTSD testimony to prove

the fact that a rape occurred. Therefore, in explaining its holding, the Court stressed that the expert "[i]n both his terminology and in his explanation [of PTSD] ... was careful to point out that severe traumas, other than rape, can produce the disorder which warrants the diagnosis of PTSD." *Allewalt,* 308 Md. at 108, 517 A.2d at 750. The Court also found significant that the expert did not attempt to express a personal opinion as to the victim's credibility, venturing into that area only in response to a defense question emphasizing that a PTSD diagnosis depended on the truth of the history received. *Id.* at 109, 517 A.2d at 750–51. Moreover, the Court pointed out that the expert "testified in the State's rebuttal case after Allewalt had acknowledged having had intercourse with Mrs. Lemon and after he swore it was consensual." *Id.*[12] With this background, we said:

Just as a jury can understand that evidence of the complainant's hysteria shortly following an alleged sexual assault tends to negate consent, so a jury, with the assistance of a competent expert, can understand that a diagnosis of PTSD tends to negate consent where the history, as reviewed by the expert, reflects no other trauma which in the expert's opinion could produce that medically recognized disorder. By requiring a full explanation on direct, by allowing liberal cross-examination, and by proper jury instructions, all of which occurred in this case, the trial court can prevent any impression that the psychiatric opinion is like a chemical reaction.

*Id.*

The line of cases that holds that PTSD testimony is admissible only in rebuttal to refute evidence challenging the consis-

---

**12.** Given the nature of such testimony, it is the danger of unfair prejudice and the lack of necessity that precludes the State from proving lack of consent, an element of its case, by proof that the victim is suffering from PTSD. Where the defendant alleges consent, however, the necessity for the rebuttal evidence and the concession as to the act having occurred outweigh the prejudicial effect of that evidence. Thus, whenever the consent defense is generated, whether in the State's case or in the defendant's case, it may be rebutted by PTSD testimony.

tency of the victim's behavior with that of someone who has been raped or abused, *see, e.g., Bledsoe,* 203 Cal.Rptr. at 457, 681 P.2d at 298; *Spigarolo,* 556 A.2d at 123; *Beckley,* 456 N.W.2d at 405; *J.Q.,* 687 A.2d at 1201, does so on the basis that, "because the consequences of the unique trauma experienced by minor victims of sexual abuse are matters beyond the understanding of the average person," *Spigarolo,* 556 A.2d at 123, like those suffered by rape victims, *see Bledsoe,* 203 Cal.Rptr. at 457, 681 P.2d at 298, such testimony is useful as an aid to the jury's evaluation of the victim's credibility. *Moran,* 728 P.2d at 245. Stated differently, "in such a context expert testimony . . . may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." *Bledsoe,* 203 Cal. Rptr. at 457, 681 P.2d at 298. The cases make clear, however, that the agent's role is that of an educator, "supplying the jury with necessary information about child sexual abuse in general, without offering an opinion as to whether a certain child has been sexually abused." *Cressey,* 628 A.2d at 702. Thus, the testimony admissible for that purpose is "limited to whether the behavior of this particular victim is common to the class of reported child abuse [or rape] victims. The expert's evaluation of the individual behavior traits at issue is not centered on what was observed in this victim, but rather whether the behavioral sciences recognize this behavior as being a common reaction to a unique criminal act." *Beckley,* 456 N.W.2d at 406–07. Given the concerns this Court expressed in allowing the PTSD testimony in the context that it did, we read *Allewalt* as being consistent with this line of cases.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT FOR REMAND TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR NEW TRIAL. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.*

RODOWSKY, Judge, concurring.

I join in the judgment of the Court because I agree that the rule of *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988), was

violated. The State asked Dr. Davis, "How do you assess credibility?" Without specific objection, she opined that the victim could not in any way have faked the consequences of the abuse. By concurring, I give the petitioner the benefit of the doubt as to preservation both at trial, through a broad continuing objection, and in this Court, through a broad certiorari petition.

I write separately, however, because I believe that a diagnosis of PTSD is relevant to whether the crime of child sexual abuse (CSA) in fact occurred. Even more important, inadmissibility under the majority's rationale is not limited to the diagnosis of PTSD in adult and child victims of shocking crimes. The majority's rationale rejects, in formulating a medical or psychiatric opinion, the use of any history from the patient that is supported only by the patient's statements. I shall address the latter aspect immediately.

## I

The terribly difficult problem that all too frequently is presented in CSA cases is that, although the testimony of the victim is legally sufficient to prove the crime, there is no other eyewitness testimony or physical evidence that corroborates the child's testimony, and that is contradicted by an adult accused. The majority furnishes three reasons for rejecting the PTSD opinion in this case. First, for the expert witness "to identify a particular stressor as the precipitating cause of PTSD, as opposed to determining that it could be the precipitating cause, requires the expert to believe that the PTSD sufferer has experienced the traumatic experience related; he or she, in other words, must believe the PTSD sufferer." 339 Md. 480, 503, 663 A.2d 1289, 1300 (1995). I shall assume that the quote correctly states the viewpoint of mental health professionals.[1]

---

1. In the instant case Ms. Jackson testified, on cross-examination, that she agreed that whether the client is telling a lie or has reason to be making up a story is of the utmost importance because "that's what a therapeutic relationship is based upon."

It would seem that if an expert found all diagnostic criteria for PTSD to be present, but for the stressor, the diagnosis would not be PTSD. If the expert concluded that the described stressor in fact occurred, but was too insignificant to permit a diagnosis of PTSD, perhaps some other disorder, or no disorder, would be diagnosed. If the expert concluded that the stressor described by the client is sufficiently severe to meet the diagnostic criteria, but that the experience did not in fact occur, although the client believes that it did occur, the diagnosis, quite possibly, would be one in which delusions or hallucinations are prerequisite findings. If the expert believes that the diagnostic criteria are met, including the stressor, the diagnosis would be PTSD. If the criteria actually exist, the diagnosis would be objectively correct. Thus, it would seem that the majority's credibility concerns arise from a possibility, the degree of which is unquantified, that the diagnostic criteria will be contained in the history which the expert accepts, but the stressor did not in fact occur. In other words there is always the possibility, to some unknown degree, that the client may deceive the expert. I can think of no other instance in the law of evidence where such a possibility renders inadmissible an expert's opinion that has an adequate basis as measured by the standards of the expert's field. To my knowledge, a suggestion of patient or client malingering or fraud goes to the weight of the opinion, not its admissibility, and is properly the subject of cross-examination of the expert.

If, as the majority literally says, the opinion of a health care provider may be excluded from evidence because the health care provider believes the patient's history, then only opinions based on physical facts, independent of history, will be admissible. That is not the law. A patient's history is essential to diagnosis and treatment. This Court, quoting Professor Wigmore, has said:

" 'When a physician examines a patient to ascertain his ailment and to prescribe for it, a portion of his reasons for action must be the patient's own statements. To exclude testimony not wholly independent of this foundation for

opinion is, in strictness, to exclude almost always medical testimony based on a personal examination.' "

*Yellow Cab Co. v. Henderson,* 183 Md. 546, 552–53, 39 A.2d 546, 550 (1944) (quoting *Wigmore on Evidence* § 688 (3d ed. 1970)). *Yellow Cab Co.* held admissible the opinion of a treating physician, based, in part, on history furnished by a child's mother, that a child's drooping eyelid was a permanent condition caused by a motor vehicle collision. *Id.* at 554, 39 A.2d at 550.

Similarly, in *Baltimore Transit Co. v. Truitt,* 223 Md. 440, 164 A.2d 882 (1960), the opinion of an attending physician was admissible to prove that a herniated disc, diagnosed in June and confirmed by surgery in August, was caused by an automobile accident of the preceding September. The opinion as to nexus was in large measure based on the patient's description of pain and when it was experienced. *Id.* at 445, 164 A.2d at 885.

Further, the majority's position is highly anomalous. Ms. Jackson and Dr. Davis, the experts in this case, qualify as treating health care providers. Ms. Jackson is a licensed clinical social worker who specializes in psychotherapy for sexually abused children. Dr. Davis is a psychologist. They are partners in practice. Ms. Jackson saw the victim in approximately forty-one therapy sessions over nearly one and one-half years. Ms. Jackson and Dr. Davis discussed the victim's case numerous times. Under the rule of evidence codified in Maryland Rule 5–803(b)(4) the victim-patient's "[s]tatements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment," are admissible *as substantive evidence* through the treating or diagnosing health care provider. *See also Morgan v. Foretich,* 846 F.2d 941, 948–50 (4th Cir.1988); *United States v. Renville,* 779 F.2d 430, 436–37 (8th Cir.1985); *State v. Robinson,* 153 Ariz. 191, 735 P.2d 801, 810 (1987). Although the law permits

treating mental health care providers to present as substantive evidence diagnostically pertinent facts contained in the client's history, the majority excludes the diagnosis from evidence because the expert has accepted the history in forming the diagnosis and, indeed, has crafted the treatment in light of the history.

It is true that this Court does not permit experts *directly to tell* a jury that they believe histories given by their patients. *Bohnert v. State*, 312 Md. 266, 277–78, 539 A.2d 657, 662–63. But the majority opinion in the instant matter goes far beyond *Bohnert.* Attending physicians who testify that they prescribed medication, therapy, or bed rest for a patient, exclusively based on the patient's description of physical pain, impliedly give credence to those subjective complaints. Nevertheless, their medical opinions as to the cause of the objectively unconfirmable complaints have been admissible. The opinions of mental health care providers, based on the diagnosis of a mental disorder, should not be treated differently.

Very recently this Court allowed a recovery under the workers' compensation law for PTSD. The claimant was nearly killed when a steel beam fell through the ceiling of the claimant's workplace and barely missed her. *Belcher v. T. Rowe Price Found., Inc.*, 329 Md. 709, 621 A.2d 872 (1993). In *Belcher* there were numerous eyewitnesses to the accident so that there was no issue in the litigation concerning the stressor. If, however, we assume the same type of accident, without any eyewitness but the claimant, and if we further assume a dispute as to the claimant's proximity to the falling beam, I submit that the diagnosis of PTSD, based on history, would nevertheless be admissible to prove that the claimant actually endured a harrowing event beyond ordinary human experience. The majority, on the other hand, says that the physician's use of the stressor, described in the history, in order to make a diagnosis embodies a credibility determination that may render the opinion inadmissible. This contradicts *Belcher* which, after referring to "the ever increasing knowledge in the specialties which have evolved in the field of medicine and in the disciplines of psychiatry and psychology,"

tells us that "[w]e are now aware that mental injuries can be as real as broken bones and may result in even greater disabilities." 329 Md. at 736, 621 A.2d at 885.

The second reason given by the majority for rejecting Dr. Davis's diagnosis of PTSD has five elements. "[B]ecause such a diagnosis implicates [1] the credibility of the victim, allowing the expert to identify the traumatic event precipitating the PTSD runs a great risk in a jury trial [2] that the jury's function will be usurped, *i.e.*[, 3] the jury will give the expert opinion too great weight and [4] not realize it is [5] solely dependent on the veracity of the patient." 339 Md. at 503, 663 A.2d at 1300. The first point, that diagnosis implicates credibility through the use of history, has been fully discussed above.

The second point, usurping the jury's function, has been castigated by Wigmore.

> "[T]he phrase is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric. There is no such reason for the rule, because the witness, in expressing his opinion, is not attempting to 'usurp' the jury's function; nor could he if he desired. He *is not* attempting it, because his error (if it were one) consists merely in offering to the jury a piece of testimony which ought not to go there; and he *could not* usurp it if he would, because the jury may still reject his opinion and accept some other view...."

7 J.H. Wigmore, *Evidence in Trials at Common Law* § 1920, at 18–19 (Chadbourn rev. 1978). Of course, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." Maryland Rule 5–704(a). *See also Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 584, 414 A.2d 1246, 1254 (1980).

The third element of the majority's second reason, that the opinion will be given inappropriate weight, raises the issue of prejudice versus probative value that I discuss in Part II, *infra.*

The majority's concern, that the jury may not realize that the PTSD diagnosis depends on the history, should not arise because experts are required, at some point, to state the bases for their opinions. Further, in my view, the accused would be entitled upon request to an instruction that, if the jury finds that any essential predicate of the PTSD opinion did not occur, the opinion must be disregarded. Such an instruction · is a logical application of the principle that an expert's opinion is dependent on its basis. *See Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 741–44, 625 A.2d 1005, 1010–12 (1993). Such an instruction is also analogous to the instruction required, upon request, under Md.Rule 5–703(b). If trustworthy, but inadmissible, facts or data are relied upon by an expert in forming an opinion, the jury is instructed that the underlying facts are not substantive evidence. Md.R.Evid. 5–703(b). That, however, is not a concern in the instant case. The jury saw and heard the victim, so that the historical basis for the diagnosis was in evidence through a witness who had personal knowledge.

The majority's fifth element assumes that the diagnosis is *solely* dependent on the patient's veracity. That is not correct in my opinion. The diagnosis, including identifying the stressor, requires the diagnostician's expertise.

The majority's third reason for rejecting a PTSD diagnosis is similar to the other two. It is said that "credibility assessment [is] a matter outside his or her area of expertise...." 339 Md. at 503, 663 A.2d at 1300. In the position statement of the American Academy of Child and Adolescent Psychiatry, *Guidelines for the Clinical Evaluation of Child and Adolescent Sexual Abuse,* 27 J.Am.Academy of Child & Adolescent Psychiatry 655 (1988), the tenth guideline calls upon the mental health professional to assess the child's credibility. *Id.* at 656. Under Maryland's child abuse and neglect statutes every reported case of suspected child abuse, including CSA, is investigated. Maryland Code (1984, 1991 Repl.Vol.), § 5–706 of the Family Law Article. The investigation includes "a determination of the nature, extent, and cause of the abuse...." § 5–706(c)(1). "The agencies responsible for in-

vestigating reported cases of suspected sexual abuse ... shall implement a joint investigation procedure for conducting joint investigations of sexual abuse." § 5–706(f)(1). "The joint investigation procedure shall ... include appropriate techniques for expediting validation of sexual abuse complaints." § 5–706(f)(2)(i). "Validation," an integral part of the legislatively mandated process, includes assessing the child's credibility. Once the matter reaches the trial stage of a criminal prosecution, however, jurors are not told how the case got that far. But, inasmuch as the expert witnesses for the State at trial are usually those who participated in the "validation," it is inaccurate for the majority to reject a PTSD diagnosis for lack of the expert's experience or "expertise" in evaluating the diagnostically relevant history.

## II

My thesis in this Part II is that a diagnosis of PTSD, properly explained, is not unfairly prejudicial in CSA cases. The diagnosis is relevant because, if the anxiety disorder exists, the fact that CSA actually occurred becomes more probable. The diagnosis is reliable because this anxiety disorder has been recognized in the behavioral science community for some time, and because that community now recognizes CSA as a potential stressor of PTSD. Thus, so long as the expert makes clear the extent to which the diagnosis is dependent on the plaintiff's history, the evidence is not unduly prejudicial.

A diagnosis of PTSD resulting, per history, from CSA is not a scientific test for determining CSA. Similarly, the expert's opinion in *State v. Allewalt*, 308 Md. 89, 517 A.2d 741 (1986), that the complainant in that case suffered from PTSD resulting, per history, from rape, did not present the opinion as if it were "a scientific test the results of which were controlled by inexorable, physical laws." *Id.* at 98, 517 A.2d at 745. "Indeed, the empirical literature on effects of abuse in general does not support the idea that there are consistent psychological responses to sexual abuse." L. Berliner & J.R. Conte, *Sexual Abuse Evaluations: Conceptual and Empirical Obsta-*

*cles,* 17 Child Abuse & Neglect 111, 116 (1993). *See also* A.B. Rowan & D.W. Foy, *Post–Traumatic Stress Disorder in Child Sexual Abuse Survivors: A Literature Review,* 6 J.Traumatic Stress 3, 4 (1993) ("While a unique and identifiable syndrome describing the sequelae of CSA has not been identified, research over the past decade clearly documents the long-term consequences upon survivors of CSA." (citations omitted)).

A diagnosis of PTSD in CSA cases is helpful to the jury because it places before the jury relevant information that is additional to the evidence of the abusive conduct. By utilizing the history of the abusive conduct and of the relevant symptoms, together with observation and any required psychological testing, behavioral science experts may apply their special training, knowledge and experience to diagnose an anxiety disorder that is generally recognized in their science or discipline. By pointing out a meaningful relationship between the psychological responses of the victim and the abuse described by the victim, the experts can bring cohesion to an otherwise possibly disjointed collection of sequelae and thereby assist the jury. If the total psychological picture, as explained by the expert, makes sense to the jury, then it is more likely that the victim's description of the stressor is the fact of the matter.

The foregoing analysis of relevance is precisely that employed by this Court in recognizing the admissibility of psychological profile evidence in *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988). *Simmons* was a prosecution for second degree murder in which the accused raised imperfect self-defense, *i.e.,* his subjective belief that the force employed, although objectively unreasonable, was necessary to prevent imminent death or serious bodily harm, which would have reduced the offense to manslaughter. Simmons proffered to show through a psychiatrist that his testimony describing his subjective belief was consistent with his psychological profile. The trial court rejected the proffer because the opinion would usurp the function of the jury. *Id.* at 36, 542 A.2d at 1259. This Court held that the trial court abused its discretion in rejecting the proffer. We said that

"the proffered testimony has some relevance in that consistency between the specific subjective belief testified to by Simmons and Simmons's psychological profile tends to make it more likely that Simmons in fact held that subjective belief. Had the trial judge appreciated that the second proffer fell within the limitation described in the preceding paragraph, the judge might well have exercised his discretion to admit the evidence. *See Allewalt,* 308 Md. at 109, 517 A.2d at 751."

*Simmons,* 313 Md. at 48, 542 A.2d at 1265.

The determinative issue in the present matter is whether the probative value of the PTSD opinion outweighs any improper prejudice. After reviewing more literature in the fields of law and behavioral science than can be set forth in this opinion, I am satisfied that diagnoses of PTSD in CSA cases can be made reliably. It further appears that sexually abused children suffering from PTSD are a subset of the set of sexually abused children and that there is a broad consensus in the behavioral science community that the subset is more readily identifiable than the set. I shall direct attention first to the larger group.

Professor John E.B. Myers and a team of medical and mental health professionals, writing in 1989, asked and gave their answer to the following question:

"Are professionals trained in the patterns, effects, and dynamics of child sexual abuse capable of determining whether a child's behavior and symptoms are consistent with sexual abuse? As recently as ten years ago, a persuasive argument could be made that the answer was no. Today, however, many experts believe that enough is known about child sexual abuse to permit qualified professionals to formulate reliable clinical judgments about sexual abuse."

J.E.B. Myers, et al., *Expert Testimony in Child Sexual Abuse Litigation,* 68 Neb.L.Rev. 1, 73 (1989).

A number of courts admit expert testimony describing the characteristics or behavior of sexually abused children generally, together with a description of similar characteristics or

behavior observed in the victim. *See, e.g., United States v. St. Pierre*, 812 F.2d 417, 419–20 (8th Cir.1987); *United States v. Harrison*, 31 M.J. 330, 332 (CMA 1990); *People v. Payan*, 220 Cal.Rptr. 126, 130–33 (1985); *In re Cheryl H.*, 153 Cal.App.3d 1098, 200 Cal.Rptr. 789, 800–01 (1984); *People v. Koon*, 724 P.2d 1367, 1369–70 (Colo.App.1986); *Ward v. State*, 519 So.2d 1082 (Fla.App.1988); *State v. Reser*, 244 Kan. 306, 767 P.2d 1277, 1279 (1989); *State v. Myers*, 359 N.W.2d 604, 608–09 (Minn.1984); *State v. Alberico*, 116 N.M. 156, 861 P.2d 192, 212 (1993);[2] *State v. Reeder*, 105 N.C.App. 343, 413 S.E.2d 580, 583–84 (1992); *State v. Timperio*, 38 Ohio App.3d 156, 528 N.E.2d 594, 596–97 (1987); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215, 1218–21 (1983); *State v. Edward Charles L., Sr.*, 183 W.Va. 641, 398 S.E.2d 123 (1990). Some courts have admitted characteristics or behavior testimony, but only to rebut or to explain victim conduct on which the defense has focused as arguably inconsistent with CSA. *See, e.g., State v. Moran*, 151 Ariz. 378, 728 P.2d 248, 253–54 (1986). Other courts allow PTSD evidence in CSA cases as substantive evidence on the issue of whether the abuse occurred. *See Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1215–17 (Alaska 1991) (civil action); *Kruse v. State*, 483 So.2d 1383, 1387 (Fla.App.1986); *Townsend v. State*, 103 Nev. 113, 734 P.2d 705, 708 (1987). Still other courts have allowed

---

**2.** In *Alberico*, the diagnosis was PTSD. I have classified it as a "characteristics or behavior" case because the court held that "the expert may not testify that the victim's PTSD symptoms were in fact caused by sexual abuse." 861 P.2d at 212. The key words here may be "in fact." The court pinpointed the issue to be not " 'whether a diagnosis of PTSD or RTS is a valid means of determining whether a rape occurred;' rather, it is whether PTSD evidence is probative of whether a rape occurred." *Id.*, at 208. The court then, with seeming approval, referred to the testimony of the experts in the cases before it to the effect "that psychologists can isolate the cause of the symptoms because different stressors manifest themselves in different symptoms." *Id.* at 209. The court stated it was "more persuaded by evidence as to the current state of the technique than by judicial determinations of validity based on evidence that is many years old." *Id.* I interpret the reference to different stressors' manifesting different symptoms to apply to that diagnostic criterion of PTSD involving the persistent re-experiencing of the particular stressor.

expert testimony as to the credibility of the CSA victim. *See, e.g., State v. Kim,* 64 Haw. 598, 645 P.2d 1330, 1334–35 (1982), *but see State v. Batangan,* 71 Haw. 552, 799 P.2d 48 (1990); *State v. Geyman,* 224 Mont. 194, 729 P.2d 475, 479 (1986).

When so many courts are prepared to accept "characteristics or behavior" evidence in CSA cases, I submit that this Court should accept a diagnosis of PTSD in CSA cases because the latter is much more reliable than the former. One scholar has studied the problem by analyzing 122 appellate court decisions in which expert witness testimony on the characteristics of sexually abused children had been challenged. M.A. Mason, *A Judicial Dilemma: Expert Witness Testimony in Child Sex Abuse Cases,* J. Psychiatry & Law 185 (Fall–Winter 1991). Dr. Mason observes:

"The data in this study demonstrate that these appellate courts are concerned with the form in which the expert testimony is presented—i.e., not presented as a specific syndrome, or offered on rebuttal rather than affirmatively—but are reluctant to look beyond the form to examine critically the content of the testimony or the standing of this diagnostic tool within its professional community."

*Id.* at 202. And further:

"The American Psychiatric Association does not include the sexually abused child syndrome in its diagnostic manual, the *DSM–III–R.* This fact was noted by three appellate courts in their reason for excluding the expert's testimony.... This omission reflects the controversy in the clinical community regarding the validity of a universal symptomology of sexual abuse."

*Id.* at 203.

No dispute of comparable degree exists in the behavioral science and mental health fields with respect to PTSD. It has long been recognized in the Diagnostic and Statistical Manuals of Mental Disorders of the American Psychiatric Association. Extremely significant for present purposes is the position taken in the most recent edition, *DSM–IV* (1994). After listing sexual assault among the violent personal assaults that

can qualify as PTSD stressors for diagnostic purposes, *DSM–IV* adds the following language which is new in relation to prior editions: "For children, sexually traumatic events may include developmentally inappropriate sexual experiences without threatened or actual violence or injury." American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders IV* (1994), at 424. Childhood sexual abuse is referred in *DSM–IV* as an "interpersonal stressor" of PTSD. *Id.* at 425.

A.B. Rowan & D. Foy in *Post–Traumatic Stress Disorder in Child Sexual Abuse Survivors: A Literature Review,* 6 J. Traumatic Stress 3 (1993), did what the title of their publication states. They advise that "each of the above studies examining PTSD among children who were sexually abused found evidence of a high rate of PTSD in their samples, three out of four studies finding 42 to 50% prevalence rates." *Id.* at 8. While urging further study, the authors conclude that "[a]t this time, the PTSD model appears to describe the core features of the psychological difficulties of many survivors, especially those who experienced high levels of abuse exposure." *Id.* at 17. They state that "PTSD research demonstrates that the traumatic nature of the abuse is the primary etiological factor behind the person's difficulties." *Id.* at 18.

At trial in the instant matter, the fourteen year old victim testified that she had been used by the accused for oral and vaginal sex, two to three times per week, from ages seven to thirteen. She had been in therapy for over one year. There is no suggestion that the diagnosis of PTSD was made in a borderline or inappropriate case. The opinion does not purport to carry more scientific validity than was justified. The trial court correctly exercised its discretion in admitting the opinion as more probative than unfairly prejudicial.

## III

In concluding its opinion the majority states that a diagnosis of PTSD resulting from CSA would become admissible if the defendant were to inject an issue into the case which made the

testimony relevant. Indeed, in an exercise of revisionism, the majority pretends that *Allewalt*'s foundation rests on relevance through rebuttal. This reading of *Allewalt* elevates the procedural posture of the case when the evidence was admitted over the substance of the admissibility analysis. More important, the theory of "admissible in rebuttal" is logically fallacious.

As the Supreme Court of New Mexico pointed out in *State v. Alberico* "[t]he issue ... is whether PTSD testimony is grounded in scientific knowledge, and the scientific validity of PTSD is not dependent on whether the defense has made it an issue in the case." 861 P.2d at 210. Part II of this concurring opinion presents why a diagnosis, based on history, of PTSD brought on by CSA is scientifically valid. Thus, the evidence is both competent and inherently relevant to the issue of whether abuse occurred. Hence, it is admissible in the State's case in chief. If the evidence is not competent, it does not become competent because an additional ground of relevance is generated by some issue injected into the case by the accused.

In sum, experts who have diagnosed PTSD based on CSA are prevented from presenting themselves in court as human lie detectors by the "don't tell" rule of *Bohnert.* The diagnosis is relevant and reliable. Some basic woodshedding by prosecutors, however, would seem to be required so that experts in these cases will clearly describe history as history when stating the basis for their opinions.

Chief Judge MURPHY has authorized me to state that he joins in the views expressed herein.

ELDRIDGE, Judge, concurring:

For the reasons set forth in the dissenting opinion in *State v. Allewalt,* 308 Md. 89, 111–125, 517 A.2d 741, 752–759 (1986), I concur in the result only. *See also Acuna v. State,* 332 Md. 65, 77, 629 A.2d 1233, 1239 (1993) (Eldridge and Bell, JJ., dissenting).