916 A.2d 410

**Maouloud BABY**

v.

**STATE of Maryland.**

**No. 225, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Feb. 9, 2007.

Michael R. Malloy (Nancy S. Forster, Public Defender, on brief), for appellant.

Sarah Page Pritzlaff (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, KENNEY and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, J.

The initial trial of appellant, Maouloud Baby, on charges of first-degree rape and related offenses, held in the Circuit Court for Montgomery County on August 23–27 and 30–31 and September 1, 2004, ended in a mistrial due to a hung jury. At a retrial in the Circuit Court for Montgomery County (Scrivener, J.), held on December 13–17 and 20–21, 2004, he was convicted of first-degree rape, first-degree sexual offense and two counts of third-degree sexual offense. On February 17, 2005, Baby was sentenced to a term of fifteen years imprisonment, with all but five years suspended and five years probation upon his release. From the convictions and sentences, appellant files this appeal presenting the following three issues for our review:

I. Whether the circuit court erred by refusing appellant's request to instruct the jury that it should return a verdict of not guilty of rape if it was persuaded by the evidence that the complaining witness consented to sexual intercourse, but withdrew her consent after penetration;

II. Whether the circuit court erred by denying appellant's request to remove a juror who indicated that he had read a newspaper article about the case; and

III. Whether the circuit court erred in denying appellant's motion *in limine* to exclude expert testimony in reference to "rape trauma syndrome."

For the reasons set forth, *infra*, we shall reverse the judgments of conviction and remand for further proceedings.

## FACTUAL BACKGROUND

At trial, the complaining witness, J.L., testified that, at the time of the incident at issue, she was an eighteen-year-old student at Montgomery College. On the night of December 13, 2003, accompanied by her best friend, Lacey, she went to the McDonald's Restaurant located in Montgomery Village.

Appellant, Lacey's younger brother and her boyfriend at the time were all friends.

When J.L. and Lacey were about to leave, appellant, who was sixteen years old at the time, prevailed upon J.L. to give him and a friend, Mike, a ride in her Chevrolet Cavalier, which she had owned for approximately seven months. Mike and another person identified as a "Hispanic boy" were passengers in the back seat of the car. When the group arrived at its destination, a community center believed by them to be the site of a party, they discovered there was no party. The Hispanic boy alighted from the vehicle and left the group.

During the return trip to McDonald's Restaurant, the complainant complied with appellant's request to park briefly near an apartment complex, thereafter proceeding back to the restaurant. The complainant complied with appellant's second request to stop at another location in a townhouse development near the McDonald's Restaurant, where all of the passengers alighted from J.L.'s car and proceeded toward a clearing between two townhouses. As appellant and Mike smoked marijuana, they discussed the possibility of getting a hotel room, noting that the boys were too young, but the girls could get a room.

Upon their arrival at McDonald's, Lacey left the group to join a friend, after which the complainant agreed to drive appellant and Mike to a residential neighborhood where she parked her car. The complainant complied with the request of appellant and Mike to sit between them on the back seat of her car. Mike put her hand down in his pants and asked her "to lick it." Appellant then asked her to expose her breasts; when she did not comply, he fondled her breast with his hand.

After J.L. acquiesced to the boys' insistence that they stay ten more minutes, she found herself on her back with appellant removing her jeans and Mike sitting on her chest, attempting to place his penis in her mouth. After she told them to stop, the pair moved her around so that her body was up in appellant's lap as he held her arms and Mike tried to insert his penis in her, but briefly inserted it into her rectum by

mistake. After Mike again tried to insert his penis in the complainant's vagina, appellant inserted his fingers in her vagina. After appellant exited the car, Mike inserted his fingers, then his penis into her vagina.

Mike then got out of the car and appellant got in. Appellant told J.L. that it was his turn and, according to the complainant, the following transpired:

Q. [ASSISTANT STATE'S ATTORNEY]: And what else did he say?

A. He, after that we sat there for a couple seconds and he was like so are you going to let me hit it and I didn't really say anything and he was like I don't want to rape you.

\* \* \*

Q. So when [appellant] said I don't want to rape you, did you respond?

A. Yes. I said that as long as he stops when I tell him to, then—

Q. Now, that he could?

A. Yes.

\* \* \*

Q. Did you feel like you had a choice?

A. Not really. I don't know. Something just clicked off and I just did whatever they said.

\* \* \*

Q. Now when you told [appellant] if I say stop, something like that, you have to stop. What did he do after you spoke those words?

A. Well he got on top of me and he tried to put it in and it hurt. So I said stop and that's when he kept pushing it in and I was pushing his knees to get off me.

Q. You were on your back and he was on top of you?

A. Yes.

Q. Did he stop pushing his penis into your vagina?

A. Not right away.

Q. About how long did he continue to put his penis into your vagina?

A. About five or so seconds.

Q. And then what happened?

A. And that's when he just got off me and that's when Mike got in the car. . . .

J.L. testified that appellant continued for five or ten seconds, but she did not believe that he had ejaculated. She testified that, as the trio proceeded back to McDonald's, appellant asked her to "jack him off," but, although she refused, she did give him her telephone number. After obtaining Lacey's cell telephone number from appellant, J.L. called her and said she was okay and would be there (at McDonald' s) in a couple of seconds. Mike parked the car across the street from McDonald's and hugged J.L. before he and appellant departed.

Thereafter, the complainant drove Lacey to Shoppers Food Warehouse, where they met J.L.'s mother and then proceeded to Lacey's house after helping J.L.'s mother to shop. Upon arriving at Lacey's house, the complainant responded in the negative to inquiries about what was wrong from Lacey's brother, but related what had happened to Lacey's mother. After the police were called, J.L. went to the hospital to be examined.

Testifying on behalf of the State was Boston College Professor of Nursing Ann Burgess, whose expert testimony was offered to explicate to the jury the rape trauma syndrome, a condition associated with post-traumatic stress disorder. Appellant had filed a motion *in limine* to exclude her testimony.

The following hypothetical was presented to Burgess by the prosecutor:

Here's the hypothetical. Please, Doctor, assume that you have a young woman who was socializing with her best friend and she met two male acquaintances through other social contacts and she thought both of these people were harmless.

Assume now that she found herself alone in a parked car with these two young men. Assume please that she was tricked into going into the backseat of the car, supposedly to have a conversation, look at a book or a magazine. However, assume that instead of having that conversation, the two men grabbed her, held her down and forced her to submit to multiple sexual acts, including sexual intercourse.

Dr. Burgess attributed complainant's failure to resist and failure to immediately report the incident and giving her home telephone number to her assailant to behavior consistent with the rape trauma syndrome.

Lacie S. testified that she and J.L. dismissed the suggestion by appellant and Mike that they get a hotel room as "normal teen talk" and that J.L. had said that she told them to stop and they did not.

Forensic nurse examiner Tracey Eichelberger testified that her examination of the complainant on the morning after the alleged rape revealed a small laceration in the vaginal and in the anal area. Dr. Julia Lojoie, upon examination of medical photographs, described one of the lacerations as a centimeter long and the other as one and one half centimeters. Karolyn Tomarksky found no semen or sperm on vaginal and anal swabs taken from the complainant.

Appellant's testimony, although at variance in material respects from that of complainant, was surprisingly consistent. He was sixteen years old and a student in the eleventh grade at the time of the incident. The complainant agreed to drive appellant, Mike and a Spanish boy to a party. After the Spanish boy left them, they discovered there was no party. On their return trip, the complainant parked her car in a residential neighborhood and they all got out. Appellant and Mike smoked marijuana and suggested getting a hotel room, given that the girls were old enough to rent a room. When they began discussing sex, appellant produced three condoms. Lacey told the others that she did not want to accompany them.

After driving Lacey back to the McDonald's Restaurant, the complainant drove to a residential area and parked her car. J.L. climbed into the back seat between appellant and Mike, whereupon the latter put the complainant's hand in his pants. After the complainant refused appellant's request to expose her breasts, Mike asked appellant for a condom and told him to get out of the car. After waiting outside of the car for approximately fifteen or twenty minutes, Mike emerged from the car and said that he "just hit that," an expression connoting that he had had sex with the complainant. Appellant then related his version of what occurred when he entered the complainant's car:

Q. When you got in the car, what, if anything, did you say or do?

A. I asked her if she was going to let me have sex with her.

Q. What exactly did you say?

A. I said, "Are you going to let me hit that?"

Q. And what does that mean to you, "Can I hit that?"

A. Have sex.

Q. What, if anything, did she say?

A. She said yes, as long as I stop when she says to. And then I said, "I'm not going to rape you."

Q. Did you feel that was permission?

A. Yeah, I thought that that was permission.

Q. Why did you say "I don't want to rape you"?

A. Just to, because she said, "Stop when I say to," just to tell her that. It's kind of like to confirm the permission.

Appellant took out a condom and put it on. J.L. laid down on the back seat. Appellant placed himself between her legs and tried to put his penis in. He testified that the following occurred:

Q. What did you do with your penis?

A. I tried to put it in.

Q. Do you know where it was touching or what happened to it?

A. No. After I tried to put it in once, it wouldn't go in. I didn't feel nothing there.

Q. What happened? What did she say or do?

A. And then she sat up. She was like, "It's not going to go in," and that's when, after she sat up and said "It's not going to go in," that's when I took off the condom and I put it in my pocket and then knocked on the window for Michael to come in.

Q. Who said, "It's not going to go in?" You or her?

A. She did.

Q. When she sat up, what did that mean to you?

A. That meant stop.

Q. Did she say "Stop"?

A. No, she didn't. She just sat up.

Q. And you took that to mean stop?

A. Yeah.

Q. When she sat up, did you try to put it in again?

A. No, I didn't.

According to appellant, he stopped immediately and never ejaculated when the complainant sat up.

According to appellant, after Mike drove J.L.'s car back to McDonald' s, she gave appellant her telephone number and hugged Mike as she got out of the car. Thereafter, J.L. and Lacey drove away.

At the conclusion of the evidence, the trial judge instructed the jury as follows regarding evidence of "consent" to negate a charge of sexual assault and the force required to sustain a conviction for rape:

The amount of force necessary depends upon the circumstances, and no particular amount of force is required but it must be sufficient to overcome the resistance of the victim. You must be satisfied that the victim either resisted and that this resistance was overcome by force or threat of force or that the victim was prevented from resisting by force or threat of force. The victim must have resisted to the extent

of her ability at the time unless her resistance or will to resist was overcome by force or fear that was reasonable under the circumstances. Finally, "consent" means actually agreeing to the sexual act rather than merely submitting as a result of force or threat of force.

After the jury began its deliberations, it submitted two notes which read, "We're not close but would like to stay" and "Can we have until 10:30?" Shortly thereafter, a third note was read into the record: "If a female consents to sex initially and, during the course of the sex act to which she consented, for whatever reason, she changes her mind and the," I think it is, "man continues until climax, does the result constitute rape?" Appellant's counsel argued that the court should respond in the negative whereupon the following colloquy transpired:

[APPELLANT'S COUNSEL]: Yes. To me, the clear answer, the unequivocal answer to this question is no. Why? Because they ask, "If a female consents to sex initially and, during the course of the sex act to which she consented—" That means that the woman consented to the penetration. She consented to the penis going into her vagina.

The State argued that any slight intrusion into the vagina is rape. Here, this woman in the note consented to sex and allowed a penis to go into her vagina. This is during the sex act. During the sex act, the man ejaculates, but the penis is inside of her when you read the note. To me, the clear answer to this question is no because she consented to the male penetration. It is in her by consent.

THE COURT: Let me say this. That is what you are assuming this note means, but I don't know that that is what it means. That is the problem.

[APPELLANT'S COUNSEL]: Well, it says—

[ASSISTANT STATE'S ATTORNEY]: No.

[APPELLANT'S COUNSEL]:—she consents to sex initially—

THE COURT: What does that mean?

[APPELLANT'S COUNSEL]:—and during the course of the sex act, she changes her mind, which means she is having sex—

THE COURT: That is what you think it means, but I don't know that that is what it means—

[ASSISTANT STATE'S ATTORNEY]: Right.

THE COURT:—that is the problem. I am going to have to, I think, respond that I am unable to answer their question as posed and that they should reread the instructions as to—

[ASSISTANT STATE'S ATTORNEY]: The elements, read the instructions.

THE COURT:—as to the element of each offense.

[ASSISTANT STATE'S ATTORNEY]: Well, and "consent," Your Honor, is specifically defined in that instruction. It means actually agreeing rather than merely submitting.

THE COURT: To an extent, it is almost like it is a factual question that they want us to answer for them. It is really a factual question as opposed to a legal question, it seems to me.

All right. How is this: "I am unable to answer this question as posed. Please reread the instructions as to each element and apply the law to the facts as you find them"?

[APPELLANT'S COUNSEL]: Judge, it seems to me the note indicates that the female in the note consented to penetration.

THE COURT: I hear you, but I don't think that is an absolute. I don't think you can necessarily know what they mean by that note. That is the problem. They have to decide the facts, apply the law to the facts.

Another note was submitted on the following morning which read, "If at any time, the woman says stop, is that rape?" In response to the request of appellant's counsel to give "the exact answer that you gave to the note last night," the court said, "Right. This is the same question in simplest or at least a variation of the same question." It then instructed the jury,

"This is a question that you as jury must decide. I have given the legal definition of rape which includes the definition of consent."

## LEGAL ANALYSIS

### I

Appellant initially contends that the trial court erred by refusing to answer the questions submitted by the jury regarding whether a sex act initially engaged in with the consent of the prosecutrix constitutes rape if the defendant continues after the victim changes her mind. Citing *Battle v. State*, 287 Md. 675, 683–85, 414 A.2d 1266 (1980), Maryland law, he asserts, holds that rape does not occur under such circumstances.

The State counters that

... the jury question was ambiguous and trial court properly exercised its discretion in not hazarding its own interpretation of the inquiry, and referring the jurors to the instructions they had already been given. Moreover, even if the question had clearly asked whether a man is guilty of rape if the woman withdraws consent after vaginal penetration has taken place, there is no Maryland authority holding that consent cannot be withdrawn after penetration. On the contrary, a person may be convicted of rape if consent is withdrawn after the initial penetration but intercourse continues by force or threat of force.

The State thus concludes that the court's instructions to the jury that "rape is the unlawful intercourse with another by force, or threat of force, and without consent, were therefore entirely proper."

### A

In initially arguing that the question posed by the jury was ambiguous, the State relies on the decision of the Court of Appeals in *Battle, supra.* There, the question posed by the jury was, "When a possible consensual relationship becomes

non-consensual for some reason, *during the course of the action* can the act then be considered rape?" Battle's counsel believed "during the course of the action" referred to "during coitus," whereas the prosecutor was of the mind that the phrase referred to "a whole chain of events" or after the parties "got in the bedroom or maybe after they had sex." The trial judge, uncertain as to its meaning, nevertheless understood the jury's inquiry to be "Where the original act of sex is by consent whether it is then possible the circumstances could change because of victim's lack of consent after the original situation began as a consensual one." The court's response, in *Battle,* was "Yes, that it is possible for a situation to start out as consensual then become a non-consensual one in the course of the event." *Id.* at 678, 414 A.2d at 1268.

In reversing the trial court, the *Battle* Court reasoned:

It is next urged by the defendant that the trial court committed reversible error in not charging the jury that in the commission of a rape, consent may not be withdrawn during the act of intercourse. The Court fully and correctly charged all of the elements constituting the crime of rape. The jury was further instructed that consent could be withdrawn at any stage "during the preparatory acts." The general rule may be summarized as follows: Consent must precede the penetration. Burdick, The Law of Crime, Vol. 2 s 484, at p. 235. *See* 44 Am.Jur., "Rape," s 8, p. 906; 52 C.J., s 26, p. 1017, and *State v. McCaffrey,* 63 Iowa 479, 19 N.W. 331 (1884). (*Id.* at 435–36, 67 A.2d at 180.)

In *State v. Allen,* 163 Kan. 374, 183 P.2d 458 (1947), the court said:

Appellant argues the evidence failed to disclose force was employed. It will serve no useful purpose to narrate the detailed facts of the episode. It may be conceded, as contended by appellant, the episode started in what appellant has seen fit to denominate a mutually desirable "petting party." It also frankly should be stated the woman admitted that at one time during the episode she contemplated sexual intercourse. The trouble is, the

evidence also discloses that it ceased to be a mutually desirable affair, the woman resisted and thereafter appellant resorted to force. The reason, or reasons, for her change of mind are not controlling. The fact she did change her mind, so advised appellant, and thereafter resisted his efforts is controlling. There was ample evidence on the subject of force to make that distinctly a jury question. (*Id.* at 375–76, 183 P.2d at 460.)

(1) Given the fact that consent must precede penetration, it follows in our view that although a woman may have consented to a sexual encounter, even to intercourse, if that consent is withdrawn prior to the act of penetration, then it cannot be said that she has consented to sexual intercourse. On the other hand, ordinarily if she consents prior to penetration and withdraws the consent following penetration, there is no rape.

The question and the answer here were confusing. In *Midgett v. State,* 216 Md. 26, 139 A.2d 209 (1958), since there was to be reversal and remand for a new trial, the Court "deem(ed) it to be necessary and desirable for the guidance of the lower court and to avoid the expense and delay of another appeal to this Court to decide the points or questions of law raised by the objection to the instructions on the law applicable to the charge of kidnapping. . . ." *Id.* at 38, 139 A.2d at 215. The Court said it was "clear that the instructions were not only misleading and confusing, but were particularly ambiguous with respect to the distinction between kidnapping and false imprisonment." *Id.* The discussion by Judge Horney for the Court is instructive:

In . . . *Wintrobe (v. Hart,* 178 Md. 289, 13 A.2d 365 (1940)), we distinguished between an instruction which is merely erroneous but at least instructs and a misleading and confusing instruction which does not instruct at all. The erroneous though instructive instruction may not be reversible when it appears that the opposite party was not injured. But, as we said, at p. 296(, 13 A.2d 365): ". . . instructions which are ambiguous, misleading, or confusing to jurors can never be classed as noninjurious."

We hold that this is especially true in a criminal case where the jury is the judge of both the law and the facts and the instruction is merely advisory. (*Id.* at 41, 139 A.2d at 217.)

We hold that the combination of the ambiguous question, ambiguously clarified by the trial judge, and the answer create sufficient confusion in this case to warrant reversal and a remand for a new trial.

■ In the case at hand, the question posed by the jury was, "If a female consents to sex initially and, *during the course of the sex act* to which she consented, for whatever reason, she changes her mind, and the . . . man continues until climax, does the result constitute rape?" Factually equating the parties' "different interpretations of the jury's question" to *Battle,* the State points out that counsel for appellant urged the court to respond that no rape, under the hypothetical, occurred because the prosecutrix had consented to the "male penetration" and the prosecutor was under the impression that the jury was asking whether consent could be withdrawn. The court, expressing the view that the question, as posed, "was a factual hypothetical that the jurors wanted the court to answer, rather than finding the facts for themselves." "I am unable to answer this question as posed," was the trial judge's response. "Please reread the instructions as to each element and apply the law to facts as you find them." The State, in its brief, urges that "this phrase is remarkably similar to the ambiguous phrase 'during the course of the action' that the Court of Appeals found ambiguous in *Battle.*" We disagree.

The plain meaning of the jury's words, "during the sex act," leads one ineluctably to conclude that the reference was to the act of intercourse. By contrast, a much broader connotation is conveyed by "during the course *of the action.*" More importantly, if there had been initially any cause for confusion, it certainly should have been cleared up when the jury submitted the second note the following morning: "If at any time, the woman says stop, is that rape?"

The victim's change of mind, posits the State, could have just as probably referred to the "various sexual acts that took place prior to vaginal penetration by Baby, which included attempted fellatio, anal penetration, and the touching of her breasts and vagina; just prior to penetration by Baby; or after penetration." The State then argues that the jury's query regarding "the man continuing until climax" and the facts that neither appellant nor the prosecutrix testified that appellant had ejaculated or that he had engaged in any sort of "back and forth motion" during the penetration is support for the court's duty to reply to the jury's question because reaching a climax was not part of the evidence in the case. (Citing *Brogden v. State*, 384 Md. 631, 866 A.2d 129 (2005)).

The State appears to suggest that lack of absolute certitude regarding the jury's inquiry renders it ambiguous. We are not persuaded that the law imposes such a standard as a condition of requiring a response to the jury's inquiry. The mere fact that the initial question referred to "the sex act," rather than, as premised by the State, "during the various sexual acts," would certainly indicate that the jury was not referring to foreplay or other acts incidental to coitus or anal intercourse. Moreover, the State's argument that absence of testimony that appellant engaged in any sort of "back and forth" motion or ejaculated is "not part of the evidence in the case" misses the point. The question, as posed by the jury, did not assume, as a fact in evidence, that appellant had achieved a climax. A fair interpretation of the jury's question is that it was an inquiry as to the legal effect of a withdrawal of consent *subsequent to* penetration, and prior to climax.

Regarding the ambiguity of the jury's questions, the State's final argument is that "it was not related to either party's theory of the case." According to the State, appellant's closing argument to the jury was that he had stopped prior to penetration when the prosecutrix sat up and said it wouldn't fit. The theory of the State's case was that J.L. had not consented to the initial penetration and that appellant "continued to force his penis into her injured vagina, despite her resistance." Seizing upon the reference to "anytime" in the

second question submitted by the jury, the State asseverates that "[t]his question makes evident that the jury was not focusing on the withdrawal of consent after penetration...."

At the outset, it is axiomatic that closing argument is not evidence in the case. Thus, the jury was not bound by the closing argument of either counsel. The jury may believe all, part or none of the testimony of any witness. *Muir v. State*, 64 Md.App. 648, 498 A.2d 666 (1985). Accordingly, the jury was free to credit the testimony of the prosecutrix that appellant had pushed his penis into her vagina, but not all the way, as well as appellant's testimony that J.L. had given her prior consent.

In *Battle*, the Court's affirmative response to the jury's question regarding a "possible consensual relationship becom[ing] non consensual" was found to be error because of the vague temporal premise, "during the course of the action." The *Battle* Court concluded that the jury's question was ambiguous, then it was ambiguously clarified by the trial judge and the answer created sufficient confusion to warrant reversal and remand for a new trial. No such confusion was presented by the question submitted by the jury in the case *sub judice*. Stripped of any hypertechnical interpretation, the jury in this case simply wanted to know if consent could be withdrawn after commencement of the "sex act," *i.e.*, penetration. The fact that there was testimony that appellant had ceased his attempt to penetrate the prosecutrix within seconds after she told him to stop leaves little doubt that the jury sought to determine when, in point of time, a withdrawal of consent would sustain a conviction for rape. The jury, in the discharge of its responsibilities to apply the law to the facts as it found them to be, was entitled to a proper response to its inquiries.

The Supreme Court put it aptly in *Bollenbach v. U.S.*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946):

The jury was obviously in doubt as to Bollenbach's participation in the theft of the securities in Minneapolis and their

transportation to New York. The jury's questions, and particularly the last written inquiry in reply to which the untenable "presumption" was given, clearly indicated that the jurors were confused concerning the relation of knowingly disposing of stolen securities after their interstate journey had ended to the charge of conspiring to transport such securities. *Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.* (Emphasis added.)

## B

The State alternatively argues that, "Even if the jury had clearly posed the question whether post penetration withdrawal of consent is rape, the instructions given accurately reflected the law in Maryland that rape is vaginal intercourse by force and without consent, regardless of whether consent is withdrawn before or after penetration." The correct answer to the jury's question, it avers, is "yes," withdrawal of consent after penetration constitutes rape.[1]

---

**1.** The State maintained throughout that J.L.'s apparent consent was never volitional. Had the jury accepted the State's major premise, the issue of withdrawal of consent would never have been considered during the deliberations. The issue of post penetration consent, was, to be sure, injected into the case, not by the appellant or the State, but rather by the jury in its consideration of the evidence during its deliberations. Although we cannot know precisely the thought processes of the jurors, the evidence was that appellant and Mike had suggested that J.L. and Lacey S. get a hotel room because the girls were older and that, when appellant and Mike began discussing sex and the former produced three condoms, Lacey, apparently uncomfortable with the turn of events, made it clear that she did not want to accompany the trio. After complying with Lacey's request to drive her back to the restaurant, J.L. drove the two boys, at night, to a residential area and parked her car on the street. She then climbed into the back seat of the car between appellant and Mike. Notwithstanding the State's theory that J.L. was tricked into joining appellant and his accomplice on the back seat of the car, the evidence presented to the jury provided at least

■ The State, in an attempt to demonstrate that the statement in *Battle* is out of step with the weight of authority, provides us with a compendium of state decisions in which, it asserts, "[a]ll but one have held a woman who initially gives consent to vaginal intercourse, withdraws consent during intercourse, and then is forced to continue intercourse, is a victim of what has been termed post penetration rape."[2]

The State next offers a series of arguments in support of the proposition that Maryland law holds that post penetration withdrawal of consent does not vitiate the criminal character of the subsequent intercourse. It points out that many of the

---

a rational inference that (1) Lacey sensed that a sexual encounter was contemplated by the two boys and chose to leave the trio; (2)that, although J.L. certainly did not relinquish her right to refuse appellant's sexual advances by climbing into the back seat of the car, by agreeing to remain with the two boys, she had abandoned the security provided by Lacey's presence; and (3) the earlier conversations about sex and appellant's production of three condoms should have been indicia of their intentions. All of the foregoing evidence was before the jury for its consideration in contradistinction to the State's theory that J.L., an eighteen-year-old college student, was tricked by two sixteen-year-old high school students. The rape trauma syndrome, discussed, *infra*, was competent evidence to explain the unusual behavior of J.L. subsequent to the sexual encounter, but would have no bearing on her actions preceding the alleged rape.

**2.** The following are citations to decisions and legal treatises discussing the concept of post penetration withdrawal of consent:

*See State v. Rusk,* 289 Md. 230, 243–44, 424 A.2d 720 (1981) (physical resistance by the victim is not required where the defendant used actual force or placed the victim in reasonable fear of force). Under Baby's view, however, if intercourse is continued by force after the victim withdrew consent, it would not constitute rape unless the victim is able to struggle against her attacker and manages to displace the male organ, however briefly, followed by an act of re-penetration by the defendant. *See Robinson,* 496 A.2d at 1070–71 (discussed in Comment, *Antiquated Notions of Womanhood and the Myth of the Unstoppable Male: Why Post–Penetration Rape Should Be a Crime in North Carolina,* 82 N.C.L.Rev. 1258, 1271–72 (2004)). The victim's ability to fight off her attacker is not, of course, an element of rape under Maryland law. *See also Siering,* 644 A.2d at 962–63 (noting "absurdity of this construction" and fact that it protects a defendant whose physical force is great enough to avoid a momentary displacement of the male organ).

decisions are dated.[3] The rationale undergirding the principle that consent, once given, cannot be retracted, it maintains, is rooted in the historical notion that, because women were, in legal contemplation, chattel, loss of chastity was considered to be a devaluation of a man's property; and that the more enlightened view espoused by feminist scholars, medical practitioners and victims militates against a legal theory that a defendant is entitled to persist in intercourse once consent is withdrawn. Finally, although the Pattern Jury Instructions make no mention of whether rape occurs when consent is withdrawn, the State relies on the definition found therein.

Appellant, citing *Hazel v. State,* 221 Md. 464, 157 A.2d 922 (1960), argues that the testimony of the complainant that he asked her permission to "do sex with her," to which she responded, "yes," and his cessation of his attempts to penetrate her within five to ten seconds after she said "stop," provides the evidentiary basis for a finding that no rape was committed. Appellant had testified that the complainant indicated that she wanted him to stop as he was trying to insert his penis into her vagina and that he withdrew "without any delay in all." The language upon which appellant relies in *Hazel* is "With respect to the presence or absence of the element of consent, it is true, of course, that however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character." *Id.* at 469, 157 A.2d 922. The *Hazel* Court continues, noting that there is a wide difference between consent and submission to the act. *Id.* Submission to a compelling force, or as a result of being put in fear, is not consent. *Id.*

Notwithstanding the language that prior consent negates the criminal character of the subsequent intercourse, the Court's opinion in *Hazel,* as the State points out, devolves principally upon the distinction between consent and submis-

---

3. *See State v. Way,* 297 N.C. 293, 254 S.E.2d 760 (1979).

sion to a sexual assault. Nor does the decision specifically address post penetration withdrawal of consent.

More problematic for the State's position, however, is the decision of the Court of Appeals in *Battle*, wherein the Court said, "On the other hand, ordinarily if she consents prior to penetration and withdraws the consent following penetration, there is no rape." *Id.* at 684, 414 A.2d 1266. The State dismisses the statement on two grounds: (1) that it was articulated as a mirror image of the precept that consent withdrawn prior to penetration constitutes rape and that it was unnecessary to the holding in *Battle* and therefore dicta; and that the opinion cited to no controlling authority [4] and has not been repeated in any other Maryland decision or incorporated into the Maryland Pattern Jury Instructions.

In arguing that neither *Hazel* nor *Battle* stand for the proposition that post penetration withdrawal of consent deprives subsequent intercourse of its criminal character, the State merely asserts that the Court never said that consent must be withdrawn prior to penetration for it to be effective or that consent withdrawn after penetration vitiates the criminal character of the act.

With respect to the State's interpretation of *Battle*, a review of the pertinent passage, in its entirety, is instructive: The Court said:

Rape was a common law crime in Maryland prior to the enactment of this section by Chapter 573 of the Acts of 1976 pertaining to sexual offenses. Thus, it was the common law crime of rape which was before the Court in *Hazel*. However, the present statutory requirement of "vaginal intercourse with another person by force against the will and without the consent of the other person" is an outgrowth of

---

**4.** As the highest court in the State, the Maryland Court of Appeals *is* the controlling authority. The State has not cited any Maryland authorities which have specifically overruled the above language found in *Hazel* or *Battle*. That the statement in *Battle* has not been repeated in any other Maryland decision may be explained by the fact that the Court has not been presented with an occasion, since 1980, to consider the issue.

the definitions of rape at common law as set forth in *Hazel.* For example, 2 J. Bishop, if Criminal Law s 1113 (8th ed. 1892) states, "Rape is the having of unlawful carnal knowledge, by a man of a woman, forcibly and against her will." Professor Bishop refers by footnote to statements on this subject by such learned authors as East, Coke, Hale, Hawkins, Blackstone, and Russell.

Regarding post-coitus consent, the Court elucidated:

The authorities are unanimous in the view that consent subsequent to the act of intercourse will not prevent its being rape. For instance, 2 J. Bishop, op. cit. s 1122, states:

> We have intimations that a consent *given during any part of the intercourse will prevent its being rape.* And certainly a consent after the assault, before the penetration, will have this effect. But as to the other question, the true view is believed to be that when the offense has been made complete by penetration, no remission by the woman or consent from her, however quickly following, can avail the man. And the Statute of Westm. 2 is express, that the liability to punishment shall remain "although she consent after." (Id. at 649.)

To like effect see, *e.g.,* F. Bailey and H. Rothblatt, Crimes of Violence: Rape and Other Sex Crimes s 433 at 279 (1973); 2 W. Burdick, The Law of Crime s 484 at 235–36 (1946) ("(I)n any case there can be no consent after the act, and the crime cannot be condoned by excusing or forgiving it."); Clark and Marshall, Law of Crimes s 5.14 at 356 (7th ed. 1967) ("(S)ubsequent consent to intercourse will not purge an assault or attempt to commit rape."); R. Anderson, Wharton's Criminal Law and Procedure s 309 at 643 (12th ed., 1957) ("Consent, to bar the commission of the offense, must precede the penetration."); 65 Am.Jur.2d Rape s 7 at 766 (1972)("After the offense has been completed by penetration, no submission or consent of the woman will avail the defendant."); and 74 C.J.S. Rape s 11 at 474 (1952).

Regarding condonation after the act of intercourse, the *Battle* Court continued:

Dean Burdick further comments:

It is said or intimated by some that consent may be given during any part of the intercourse, that is after the penetration but before completion of the coitus. However, an examination of the cases sometimes cited in support of such a doctrine shows that such comments are dicta or else made in connection with evidence relating to the alleged non-resistance of the woman and tending to show that she consented before the act. If penetration alone completes the act, it is illogical and unsound to say that consent may follow the penetration. (*Id.* at 236.)

The reason for this view is expressed by W. LaFave and A. Scott, Handbook on Criminal Law s 57 (1972), in discussing consent of the victim as a defense to crimes generally:

Condonation, the forgiveness of a criminal offense by the victim, is no defense. Sometimes this is explained on the ground that condonation is after-the-fact consent by the victim and thus cannot be any more effective than before-the-fact consent. This, however, might suggest that condonation is a defense in those circumstances where before-the-fact consent would bar conviction, but this is not the case. *While before-the-fact consent may negative an element of the offense or preclude infliction of the harm to be prevented by the law in question, this is not true of subsequent condonation.* Such forgiveness "has no proper place in the criminal law. The interest of the state is paramount and controls prosecutions ... (f)or it is the public, not a complainant, that is injured by the commission of a crime." Acts by the victim alleged to constitute ratification (formal sanction, not necessarily involving forgiveness) are for the same reason no defense. (*Id.* 410–11, *quoting People v. Brim,* 22 Misc.2d 335, 199 N.Y.S.2d 744 (1960).)

Citing *Wright v. State,* 23 Tenn. (4 Hum.) 194 (1843), the *Battle* Court concluded that there was little discussion in the cases on the effect of a withdrawal of consent prior to penetration:

It is contended, that the charge of the Judge is erroneous in this, that he said to the jury, "It is no difference if the person abused consented through fear, or that she was a common prostitute, or that she assented after the fact, or that she was taken first with her own consent, if she were afterwards forced against her will." This charge is correct in every particular, and fully sustained by authority. (*Id.* at 198.)

*State v. Auld,* 2 N.J. 426, 67 A.2d 175 (1949), is cited in 75 C.J.S. Rape, s 11, supra, along with 52 C.J. p. 1017 n. 86 for the proposition that "where the female consents, but then withdraws her consent before penetration, and the act is accomplished by force, it is rape...." (52 C.J. p. 1017 n. 86 in turn cites Wright.) In *Auld,* the court said:

*It is next urged by the defendant that the trial court committed reversible error in not charging the jury that in the commission of a rape, consent may not be withdrawn during the act of intercourse.* The Court fully and correctly charged all of the elements constituting the crime of rape. The jury was further instructed that consent could be withdrawn at any stage "during the preparatory acts." The general rule may be summarized as follows: Consent must precede the penetration. Burdick, The Law of Crime, Vol. 2 s 484, at p. 235. See 44 Am.Jur., "Rape," s 8, p. 906; 52 C.J., s 26, p. 1017, and *State v. McCaffrey,* 63 Iowa 479, 19 N.W. 331 (1884). (Id. at 435–36, 67 A.2d at 180.)

The *Battle* Court, concluding that there was ample evidence on the subject of force to make the distinction between consent and submission a jury question in *State v. Allen,* 163 Kan. 374, 183 P.2d 458 (1947), held:

Given the fact that consent must precede penetration, it follows in our view that although a woman may have consented to a sexual encounter, even to intercourse, if that consent is withdrawn prior to the act of penetration, then it cannot be said that she has consented to sexual intercourse. On the other hand, ordinarily if she consents prior to

penetration and withdraws the consent following penetration, there is no rape.

*Id.* at 680–84, 183 P.2d 458.

The in-depth analysis engaged in by the Court of Appeals in *Battle* negates any notion that the pronouncement that prior consent vitiates the criminal character of the post penetration sexual act was inadvertent or mere dicta. Nor have law review articles and other scholars so dismissed the decision.[5]

---

**5.** The following is an excerpt from a review of the line of decisions, including a reference to *Battle,* holding that post-penetration withdrawal of consent vitiates the criminal character of rape:

While Illinois is the first state to deal with post-penetration rape legislatively, other states have addressed the issue judicially. Two state courts have issued opinions unequivocally rejecting the concept of post-penetration rape—Maryland and North Carolina. Of the forty-eight remaining states, seven have unequivocally supported it— Maine, Connecticut, California, South Dakota, Minnesota, Alaska, and Kansas.

A. Courts Limiting Women's Right to Say "No"

Only two courts have found that once sex has begun, a woman cannot withdraw her consent. In 1979, the Supreme Court of North Carolina became the first state court to decide the issue in *State v. Way,* 254 S.E.2d at 761–62 holding that consent cannot be withdrawn. The following year, in *Battle v. State,* 287 Md. 675, 683–84, 414 A.2d 1266 the Maryland Court of Appeals followed suit by holding that once given, consent is absolute.

The facts of each case are very similar. In both cases, the defendant tricked the victim into accompanying him to a secluded area, where he attacked and raped her. Also in both cases, the jury sent a note to the judge during deliberation, inquiring as to whether a woman can withdraw consent once penetration has occurred. Both judges responded in the affirmative, and both were overruled on appeal. In *Way,* the North Carolina Supreme Court admitted that consent can be withdrawn, but only when the victim gives consent for a sexual act and then withdraws it regarding independent subsequent acts. If, however, within the same sexual act "actual penetration is accomplished with the woman's consent, the accused is not guilty of rape." The court reasoned that if a jury instruction such as the one at issue were allowed, "the jury could have found the defendant guilty of rape if they believed [the victim] had consented to have intercourse with the defendant and in the middle of that act, she changed her mind. This is not the law." In *Battle,* the Maryland Court of Appeals explained that once a man has penetrated a female without consent, it is rape, and "no remission by the woman or consent from her, however quickly following, can avail the man." The court argued that the opposite must also be true—"if she consents prior to pen-

Whether the statement at issue in *Battle* is dicta, however, is not the relevant question. Having decided that the trial court was obliged "to give the jury the required guidance by a lucid statement of the relevant legal criteria" once the jury expressed a need for such guidance, *Bollenbach*, 326 U.S. at 613, 66 S.Ct. 402, the relevant question—dicta or not—is whether the statement accurately represents Maryland law. More specifically, citing such "learned authors" as East Coke, Hale, Hawkins, Blackstone, Russell and Bishop, the passage succinctly discusses the common law roots of the issue at hand. Simply put, assume that the statement, as an utterance of the converse of a proposition essential to the decision, is arguably dicta. The pertinent question is whether that pronouncement is an accurate statement of the English common law which is, conceptually, the genesis of the notion that there is no rape where the prior consent is followed by penetration and then withdrawal of consent. *Battle* says that it is. The concept, undergirding the *Battle* holding, rooted in ancient laws [6] and

----

etration and withdraws the consent following penetration, there is no rape." The court implied that post-penetration rape does not exist. While the overruling courts' reasoning in each case differed from one another, the main underlying premise was the same. Once sex begins with the woman's consent, her rights disappear and her partner's subsequent behavior, however forceful or violent, is justified. His actions are beyond the purview of rape.
*No Means No: Weakening Sexism in Rape law By legitimizing Post–Penetration Rape*, 49 St. Louis U.L.J. 1229, 1231–33.

**6.** The cultural mores undergirding the notion that the crime of rape was complete upon penetration may be traced to Biblical and Middle, Assyrian Laws:

Under MAL, the rape of a virgin was presumed to be an illegal trespass upon the father's property, with the rapist required to "give the (extra) third in silver to her father as the value of a virgin (and) her ravisher shall marry her (and) not cast her off." The woman was required to marry her rapist without hope of divorce. If the rapist was married, the virgin still had to marry her rapist; however, the rapist's property, his wife, also was factored into the compensation. The rapist's wife was to be given to the father, "to be ravished . . . not to return her to her husband (but) to take her."
This approach to rape developed because a virgin was considered a valuable asset, the value residing in men's ability to gain absolute ownership of the totality of her sexual and reproductive functions. Any infringement upon this totality through premarital sexual rela-

adopted by the English common-law, views the initial "deflowering" of a woman as the real harm or insult which must be redressed by compensating, in legal contemplation, the injured party—the father or husband. This initial violation of the victim also provided the basis for the criminal proceeding against the offender.

■  But, to be sure, it was the act of penetration that was the essence of the crime of rape; after this initial infringement upon the responsible male's interest in a woman's sexual and reproductive functions, any further injury was considered to be less consequential. The damage—viewed from the perspective of the husband's or father's interest in the reproductive functions of the victim—was done. It was this view that the moment of penetration was the point in time, after which a woman could never be "re-flowered," that gave rise to the principle that, if a woman consents prior to penetration and withdraws consent following penetration, there is no rape. Maryland adheres to this tenet, having adopted the common law, which remains the law of the Land until and unless changed by the State's highest court or by statute.[7]  *Battle*

---

tions rendered the asset less valuable, and might even turn it into a liability.
*SETTING THE AGENDA FOR THE 1990s: THE HISTORICAL FOUNDATIONS OF GENDER BIAS IN THE LAW: A CONTEXT FOR RECONSTRUCTION* 42 Fla. L.Rev. 163, 172.

**7.**  Judge Eldridge, writing for the Court of Appeals in *Baltimore Sun Co. v. Mayor and City Council of Baltimore,* 359 Md. 653, 661–662, 755 A.2d 1130 (2000), discussed Maryland's adoption of the common-law and the manner of modification thereof:

In Maryland, "the rules of the common law of England were ... adopted as the principles which were to direct the proceedings of the provincial government, whether legislative or judicial...." Bozman, *History of Maryland,* Vol. 2, p. 97. This is evident as early as 1639, when the Maryland General Assembly approved the "Act for the Liberties of the People," which "may rightly be considered the first American Bill of Rights." B. Schwartz, *The Bill of Rights: A Documentary History,* Vol. 1, p. 67. The Act stated, in pertinent part, as follows: "all the Inhabitants of this Province ... Shall have and enjoy all such rights liberties immunities privileges and free customs within this Province as any naturall born subject of England hath or ought to have or enjoy in the Realm of England by force or vertue of

has not been overruled or commented upon by Maryland authorities on the question of whether withdrawal of consent after penetration constitutes rape.

The Court of Appeals of Kansas, however, in *State v. Bunyard,* 31 Kan.App.2d 853, 857, 75 P.3d 750, 755 (Kan.App. 2003), has commented upon the decision of the Maryland Court of Appeals in *Battle,* observing:

> The issue of whether consent may be withdrawn after penetration is one of first impression in this State; therefore, case law from other jurisdictions is instructive.

> In *Battle v. State,* 287 Md. 675, 683–84, 414 A.2d 1266 (1980), the Court of Appeals of Maryland held that consent must precede penetration.   In other words, if a woman consented to a sexual encounter, even to intercourse, and consent is withdrawn prior to penetration, she did not consent to sexual intercourse.   However, if she consents prior to penetration and withdraws the consent following penetration, there is no rape.

> In reviewing case law from jurisdictions other than Maryland, we conclude that the *Battle* holding has not been adopted by other courts.   In fact, the Appellate Court of Connecticut specifically rejected an argument identical to Bunyard's.

> The *Bunyard* Court, in specifically repudiating *Battle,* concluded: "It does not matter if the force or fear exists at the

the common law or Statute Law of England (*saving in such Cases as the same are or may be altered or changed by the Laws and ordinances of this Province* )."
[T]he rights embodied in the Act of 1639, specifically the right to the benefits of the common law of England, are presently embodied in Article 5 of the Maryland Declaration of Rights, originally enacted in August 1776.   Article 5 states, in relevant part:
"the Inhabitants of Maryland *are entitled to the Common Law of England,* and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six;   and which, by experience, have been found applicable to their local and other circumstances, . . . *subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State."*   (Some citations omitted;   emphasis supplied.)

initiation of the act or whether it comes after consent is withdrawn. The continuation of sexual intercourse after consent has been withdrawn and the presence of force or fear, is rape." *Id.* at 756.

One of the decisions discussed in *Bunyard* is *State v. Siering*, 35 Conn.App. 173, 644 A.2d 958 (1994), in which the jury asked, "If a person agrees to sexual intercourse, then changes her mind, withdraws her consent but is compelled to continue intercourse by use of force, does this constitute sexual assault?" The court's response was "[i]f there exists consensual sexual intercourse and the alleged victim changes her mind and communicates the revocation or change of mind of consent and the other person continues the sexual intercourse by compelling the victim through the use of force, then it would be sexual assault in the first-degree. This is not just someone withdrawing their consent, but it's a withdrawal of consent communicated to the other and then the sexual intercourse continues by compelling the victim through the use of force."

The *Siering* Court, describing as "absurd" the defendant's argument essentially requiring, to establish rape, a dislodging of the male organ where consent is withdrawn, noted that a review of limited case law from other jurisdictions reveals only three decisions which appear to hold that prior consent vitiates post penetration withdrawal of consent. Although the decision of the Maryland Court of Appeals in *Battle* is one of the three decisions, the Court chose not to include it in its analysis, stating, "In one of those cases, however, the discussion of this issue is arguably dicta and thus will not be discussed here."

Another decision discussed in *Siering*, recognizing that post penetration withdrawal of consent constitutes rape, is *State v. Robinson*, 496 A.2d 1067 (Maine 1985). There, the question submitted by the jury was, "Concerning the law—if two people began consenting to an act, then one person says no and the other continues—is that rape?" The Court's response was, "If a couple consensually engages in sexual intercourse and one or

the other changes his or her mind, and communicates the revocation or change of mind of the consent, and the other partner continues the sexual intercourse by compulsion of the party, who changes her mind, then it would be rape. The critical element in there is the continuation under compulsion." Finding that the trial judge's supplemental instruction was a correct statement of the law, the Supreme Judicial Court of Maine held that "... [i]f the jury credited the defendant's story to the extent of his claim that the prosecutrix changed her mind in the middle of their consensual sexual intercourse, it could, under the court's instruction, have returned its guilty verdict *only* if it found as a fact that the defendant compelled the woman to submit to his continued intercourse with her *for a period* after she had revoked her original consent."

With respect to *People v. Vela*, 172 Cal.App.3d 237, 218 Cal.Rptr. 161 (1985), *Siering* describes as archaic and unrealistic the underlying reasoning that no rape occurs if a woman, who initially consents, later withdraws her consent and the male forcibly continues the act without interruption on the theory that "the outrage experienced by a female who has withdrawn her consent is not of the same magnitude as that resulting from the initial non-consensual violation of [the victim's] womanhood."

The other decision decried by *Siering* is *State v. Way*, 297 N.C. 293, 254 S.E.2d 760 (1979). In *Way*, the trial judge had instructed the jury that intercourse continued by force after withdrawal of consent became rape from the point that it was no longer consensual. The North Carolina Supreme Court, however, reversed the trial judge, holding that consent could be withdrawn only if there was more than one act of intercourse and the consent was withdrawn between the acts.

■■■ Although *Siering*, as does the State, denominated the language at issue in *Battle* as "arguably" dicta, *Bunyard* refers to it as "the holding of *Battle*." As noted, whether the *Battle* pronouncement is dicta is immaterial to the trial court's obligation to inform the jury of the current status of Maryland law. It is currently a statement of Maryland law, that has

neither been overruled nor commented upon negatively. Whether it should be revisited in light of the weight of authority to the contrary[8] is a matter for the Maryland legislature or the Court of Appeals. Under *Battle*, no rape occurred if the jury found that the prosecutrix withdrew her prior consent after penetration. The trial judge was obliged to answer the jury's questions and it should have been advised that, under Maryland law, the answer is "no" to the question, "If a female consents to sex initially and, during the course of the sex act to which she consented, for whatever reason, she changes her mind and the ... man continues until climax, does the result constitute rape?" The holding in *Battle*, of course, would not have been a bar to a conviction for common law assault for any continuation of the sexual act against the complainant's will after the withdrawal of consent.[9]

## II

Because appellant's second issue may recur at a retrial, we shall address it. He contends that the circuit court "erred by

---

**8.** In the states which have adopted the common law, the principle that post penetration withdrawal of consent does not constitute rape has been changed by statute or court decision.

**9.** In light of our holding that the trial court erred by refusing to respond to the jury's question, we need not reach an issue which was apparently of concern to the jury. The testimony of the complainant and appellant regarding the interval between her command to stop and his acquiescence was surprisingly consistent; she said that he stopped after five or ten seconds and he said that he withdrew "without any delay at all." Our research reveals a paucity of decisions regarding what constitutes "ample time," as a matter of law for a defendant to terminate an initially consensual sexual encounter once the complainant demands that he stop. In cases where the time intervals are five to ten minutes (*State v. Bunyard*, 31 Kan.App.2d at 857, 75 P.3d at 755 (2003)), four to five minutes (*In re John Z.*, 29 Cal.4th 756, 762, 128 Cal.Rptr.2d 783, 60 P.3d 183, 187 (2003)) or longer, the contention that "a defendant must have a reasonable time" in which to respond to the victim's withdrawal of consent has been dismissed, out of hand, as a matter of law, the court in *In re John Z.* stating, that the defendant was given "ample time" to withdraw, and that his failure to cease intercourse was not reasonable. We have found no decision, however, involving a *de minimis* time interval, as in the case *sub judice*. We leave for another day consideration of that issue.

refusing to remove a juror from the jury at the point when the juror admitted that he had read a newspaper article about the appellant's case." "By allowing the juror to remain on the jury," he avers, "the court subjected appellant to the risk that the juror would unfairly influence one or more of his fellow jurors by communicating to them information prejudicial to appellant that was learned outside the trial."

At the beginning of the afternoon session of the third day of appellant's trial, a newspaper article reporting the proceedings appeared in the Weekly Gazette newspaper located in the lobby of courthouse. In addition to the facts that he had previously been tried on the same charges, and that he was facing life imprisonment on his retrial, the article disclosed that his co-defendant, Michael Wilson, had entered a plea of guilty. The court, pursuant to the request of counsel for appellant, inquired of the jurors whether they had read the article.

In response to the court's inquiry as to whether any of the jurors "had seen any press coverage of this case," juror No. 100 indicated that he had read the article. The court then reminded jurors to ignore media coverage whereupon the court directed the jurors to leave the courtroom. After appellant's attorney moved to dismiss juror No. 100, the juror was recalled to the courtroom and asked whether having read the article would affect his ability to be fair and impartial. His reply was that it would not. "I didn't give any additional information. I was just intrigued with the fact that it was not the first time the case was tried." Although he had mentioned the article to two fellow members of the jury, he did not tell them what was in the article and, to his knowledge, they did not read the article.

Concerned that, although the juror had not mentioned that the co-defendant's guilty plea was reported in the article and that the juror might bring up the subject during jury deliberations, the court ruled that it would grant the motion to strike the juror. In consideration of the State's assurances that it had not decided whether to call Wilson as a witness, the trial

judge reversed herself and decided not to excuse the juror, ruling:

> THE COURT: All right. Well, what I am going to do at this point is reserve. I am going to reserve on this issue until the end of the trial and see whether, has Michael Wilson testified or not and how many jurors I have at the end of the trial, just in case there is a problem. I will admonish the jury they are not to discuss anything about the case, then not to read any press coverage, they are not to discuss—
>
>    \*    \*    \*
>
> Well, what may happen is, he ends up being the alternate that is excused. That is my point.
>
>    \*    \*    \*
>
> Right, well, at this point, I am just going to reserve. He is still on the jury, but he may or may not be, actually, one of the jurors that deliberates.

The trial judge had instructed the jury pursuant to Maryland Pattern Jury Instructions–Cr. 1:02, regarding publicity.[10]

The decision to remove a juror is discretionary and will not be reversed on appeal "absent a clear abuse of discretion or a showing of prejudice to the defendant." *State v. Cook,* 338 Md. 598, 607, 659 A.2d 1313 (1995); accord *Diaz v. State,* 129 Md.App. 51, 740 A.2d 81 (1999), *cert. denied,* 357 Md. 482, 745 A.2d 436 (2000); *see also Bruce v. State,* 351 Md.

---

10. The court instructed the jury:
> There may be news coverage of this case. For that reason, do not watch or listen to any television or radio news broadcasts. Do not read anything from any source about this case, about crime in general. . . . If anything occurs contrary to these instructions, please write me a note, as soon as possible, and do not discuss it with anyone else. You must completely disregard any newspaper, television or radio reports that you may have read, seen or heard concerning this case. Such reports are not evidence. You must not be influenced in any manner by publicity. Version "B" should be given at the end of any case that received media attention or if the instruction is requested.

387, 393, 718 A.2d 1125 (1998), *Pollitt v. State*, 344 Md. 318, 325, 686 A.2d 629 (1996).

A jury's verdict must be based on evidence received in open court and not from outside sources. *Sheppard v. Maxwell*, 384 U.S. 333, 351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). See generally W. LaFave & J. Israel, Criminal Procedure §§ 22.1 to 22.3 (1985 & Supp.1989). Publicity may be so prejudicial as to constitute a denial of due process. *See, e.g., Basiliko v. State*, 212 Md. 248, 129 A.2d 375 (1957); *Barber v. State*, 16 Md.App. 235, 240, 295 A.2d 814 (1972) ("where the publicity was so 'massive, pervasive and prejudicial' that it 'inflamed and prejudiced the public,' jury prejudice presumed)."

The appropriate safeguard against such prejudice "is the defendant's right to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly." *See Chandler v. Florida*, 449 U.S. 560, 575, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). The burden is on the party alleging prejudice to prove (1) that the publicity is prejudicial, (2) that a juror has been exposed to the prejudicial material, and (3) that the juror's decision was influenced by the prejudicial material. *Presley v. State*, 224 Md. 550, 555, 168 A.2d 510 (1961), *cert. denied*, 368 U.S. 957, 82 S.Ct. 399, 7 L.Ed.2d 389 (1962); *cf. Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (although eight of the twelve jurors had familiarity with the case, there was no prejudice because none had formed an opinion). The injured party's remedy is a mistrial or a reversal on appeal. *See Barber*, 16 Md.App. 235, 295 A.2d 814. *See generally*, Lynn McLain, Maryland Evidence § 303.3, at 250 n. 1 (1987 & Supp.1994).

In the instant case, appellant's attorney moved to dismiss juror No. 100 upon discovering that he had read a newspaper article about the case. The court initially ruled: "I am going to grant the motion to strike the juror." The prosecutor, seeking to convince the trial court to reverse her ruling,

informed her that the State had not made a final decision as to whether it would call Michael Wilson as a witness. Should the State decide not to call the witness, averred the prosecutor, the jury would never learn about the plea previously entered by the witness. The prosecutor, in requesting that the court "hold this juror," pointed out that he had not discussed the article with other jurors, and suggested that the court "admonish him again to make sure he does not say anything to any jurors, and if and when we do or don't put Michael Wilson on the stand, then you make a final decision." The court adopted the State's suggestion and reversed itself, stating that it would "reserve on this issue until the end of the trial" and admonish the jury not to discuss or read anything related to the case. Pellucidly, the overriding concern of the trial judge in this case was the number of alternate jurors available should, for some reason unforeseen, one or more members of the jury be removed or become incapacitated.

Baby seeks solace in our opinion in *Wright v. State,* 131 Md.App. 243, 748 A.2d 1050, *cert. denied,* 359 Md. 335, 753 A.2d 1032 (2000). There, the appellant, at his trial for first-degree murder, robbery, sodomy and assault and battery, had made a motion *in limine* to preclude disclosure to the jury of his previous conviction of sodomy and evidence of other bad acts, including bruises and rough treatment of his prior girl-friends. As exhibits in support of the motion, the appellant submitted newspaper articles reporting that appellant had been charged with the murder, the charges later having been dropped for lack of evidence.

The article also recounted that appellant had been charged with two counts of statutory rape and indecent liberties with a 15–year–old; that he had been found guilty of committing lewd and lascivious acts on a person under the age of sixteen in North Carolina; and that appellant had previous convictions for fourth-degree sex offense and perverted sex practice. A second article related that the appellant had previously been charged with the crimes for which he was being tried, but the charges had been dropped because of insufficient evidence. The trial court granted the motion *in limine,* but, during jury

deliberations, a note was submitted to the court asking if "the jury would be wrong to consider defendant's Evidence 1 and 2," the articles that had been appended to the motion *in limine* and inadvertently sent to the jury room with the other evidence admitted during the trial. In holding that perusal of these articles by the jury required a mistrial, we said:

The present case is a difficult one because of the similarity of appellant's prior offenses and those for which he was being tried, and because of the inflammatory nature of the evidence and the emotional nature of the crimes. According to the article printed in *Ocean City Today*, appellant had previously been convicted of an "indecent liberties" charge, a fourth degree sex offense charge, and a perverted practice charge. In addition, the article alleged that he had been charged with, but not convicted of, rape and a sex offense by suffocation. Further, the information was read by all of the jurors.

The evidence against appellant was strong, but not overwhelming. He was the last person seen with Ruggles on the day most likely to have been the day of her death. Her body was found in an area between Ocean City and appellant's home, in a remote area not likely to be known to someone unfamiliar with the area. In addition, there was evidence that appellant gave Corporal McQueeney a false explanation of what had occurred and that he had made inconsistent statements to Corporal McQueeney and Dolch. The jury was also entitled to believe or disbelieve the testimony of Lewis, that appellant had confessed to killing Ruggles. Absent the confession, the evidence was circumstantial and the jury could have found appellant not guilty. On the other hand, the trial court inquired of the jurors after they had read the article. *Each juror indicated that he or she could decide appellant's guilt or innocence solely on the basis of the evidence presented at trial. The trial court was able to observe the demeanor of the jurors and believed their assurances. In addition, he instructed the jurors that they were not to discuss the information in the articles during their deliberations. It is also clear that the*

*jurors took seriously their responsibility to decide the case based on appropriate evidence, as indicated by the fact that they notified the trial court when they questioned the admissibility of the newspaper articles.*

In our view, however, the dispositive factor in this case is the similarity of the offenses alleged against appellant in the prior cases to those for which he was on trial. As *Williams, supra, Hryciuk, supra,* and *Keegan, supra,* point out, *exposure to extrajudicial reports on a juror's deliberations may be substantial even though it is not perceived by the juror himself or herself.* Although the jurors may have honestly thought that they could disregard the information in the articles, in our judgment, any doubts the jurors may have had, reasonable or otherwise, would have been resolved against appellant—even if only subconsciously—as a result of the information contained in the articles.

*Id.* at 270–71, 748 A.2d 1050 (emphasis added).

In *Wright,* we considered the relevant factors in a determination of whether exposure to inflammatory and prejudicial news articles requires the grant of a mistrial. It is uniformly recognized that such cases must be decided on their own facts. *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Moreover, the trial judge has broad discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. *Id.* We begin our analysis, however, with the fact that, unlike many of the landmark cases, only one juror was found to have read the article. *Wright* further instructs that, except where prejudice is manifest, a trial court is entitled to rely on the assurances of jurors that they would be able to reach a verdict based only on the evidence at trial even in cases where jurors possessed knowledge of extraneous extrajudicial information about the case being tried. *See Wright,* 131 Md.App. at 260, 748 A.2d 1050.

It logically follows, then, that a trial judge may rely on assurances where, as here, such assurances relate to whether juror No. 100 told the other jurors about the contents of the

article and his assurance that "they [the other jurors] didn't read the article." Of course, the factor most troubling is that the article contained information that the co-defendant had entered a plea of guilty. It is a very short leap from knowledge of the accomplice's guilt and the guilt of appellant by association, particularly where appellant may have been convicted on a theory that he aided or abetted Wilson as to certain offenses. We are satisfied, however, that the potential undue prejudice is ameliorated by the fact that, in the first instance, the record discloses no evidence that the information contained in the article was ever imparted to the members of the jury who ultimately deliberated and found appellant guilty. In the final analysis, dispositive of appellant's claim is the fact that, notwithstanding the four-day interval that juror No. 100 continued to sit on the jury, the court did ultimately excuse him. In the absence of evidence that the juror imparted to the other jurors the information contained in the article, appellant's claim of prejudice fails.

### III

For guidance of the circuit court, on remand, we consider appellant's final assignment of error. He argues that the circuit court's denial of his motion *in limine* to exclude the testimony of Dr. Ann Burgess, a professor of psychiatric nursing and a nurse practitioner with a doctorate in nursing science was reversible error. She was offered by the State as an expert witness to explain how aberrant behavior of victims of sexual assault can be attributed to the "rape trauma syndrome," asserted to be a subset of post-traumatic stress disorder. The basis of appellant's motion *in limine* was that Dr. Burgess's testimony should be excluded because she had not interviewed or examined the prosecutrix and that a "general explanation of post traumatic stress disorder, and how the psychological symptoms are manifested in their reactions of rape victims" was not specific to the case. Additionally, appellant claimed that testimony "would be hearsay, irrelevant, highly, highly, highly prejudicial, then goes beyond the boundaries of the testimony and the areas that this the jury

should consider." In denying appellant's motion *in limine,* the court ruled:

It is my belief that the case law does specifically authorize testimony on this issue, so long as [sic] is used to explain the syndrome and the behavior that's part of the syndrome, as opposed to saying "This victim was raped because she did this." That's what they can't do.... But they can offer testimony as to what Post Traumatic Stress Disorder is, what Rape Trauma Syndrome is, when it's relevant to certain issues in the case.

Prior to the commencement of appellant's second trial, the trial judge reasserted her earlier ruling: "I'm going to continue to deny the defense motion with respect to Dr. Burgess for the same reasons I denied it in the last trial. Just as you all incorporated your arguments, I'll incorporate my rulings." Preliminarily, Dr. Burgess testified that prior to trial, she had reviewed the police statement, the indictment, the forensic nurse examiner report and an audio cassette. As noted, *supra,* Dr. Burgess was presented with a hypothetical based on testimony in this case, with special reference to the State's theory that J.L. believed that appellant and his cohort were harmless and that she was tricked into joining them in the back seat of her vehicle. Dr. Burgess attributed the victim's failure to resist, her failure immediately to report the incident and her voluntarily giving her home telephone number to the alleged assailant to the rape trauma syndrome. More specifically, Dr. Burgess testified that there were three stages of rape trauma syndrome, the initial impact phase, the acute phase of disorganization and the reorganization phase.

The State initially asserts that the issues presented in appellant's third argument are unpreserved, including whether he may challenge "for the first time on appeal" the use of the term, citing language in *State v. Allewalt,* 308 Md. 89, 517 A.2d 741 (1986), that "there are inherent implications from the use of the term 'rape trauma syndrome' for it suggests that the syndrome may only be caused by rape." We think appellant's objection to admission into evidence of the concept

subsumes and is part of the challenge to the use of the term. The issues presented were vigorously opposed in the trial court at two separate proceedings; we shall therefore consider the merits.

Denominating it as "careless dictum," appellant acknowledges that the Court of Appeals, in *Hutton v. State*, 339 Md. 480, 504, 663 A.2d 1289 (1995), stated that ... expert testimony on post traumatic stress syndrome or on "rape trauma syndrome" may be admissible when the issue was consent. He hastens to add, however, that the Court of Appeals reversed Hutton's conviction because "the PTSD evidence was offered to prove that the alleged sexual abuse had occurred."

In *State v. Allewalt*, 308 Md. 89, 109–10, 517 A.2d 741 (1986), the Court of Appeals reviewed our decision in *Allewalt v. State*, 61 Md.App. at 505, 487 A.2d 664 (1985), and set forth the parameters for admission of evidence of the Post Traumatic Stress Disorder:

> We hold only that in this case the trial court did not abuse its discretion in admitting the testimony of Dr. Spodak. We emphasize that admissibility is a matter of trial court discretion based on the facts. When a trial judge admits PTSD evidence because *he believes that the existence of the disorder coupled with the absence of any triggering trauma, other than the evidence of rape, will aid the jury the ruling necessarily carries certain baggage with it.* Cross-examination can include not only cross-examining the expert about PTSD in general, but also cross-examining the expert and the prosecutrix about possible causes of the disorder other than the assault charged in the criminal case. In addition, we can foresee cases where the defendant will seek to counter the State's PTSD evidence with his own expert testimony. That can, in turn, lead to issues concerning compulsory psychiatric examination of the complainant by an expert for the defense. Lurking in the background is the nice question of whether the absence of PTSD is provable by the accused in defense of a rape charge, as tending to

prove that there was consent. *See,* as to RTS generally, Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and its Implications for Expert Psychological Testimony,* 69 Minn.L.Rev. 395 (1985); Comment, *Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecution,* 33 Am.U.L.Rev. 417 (1984); Note, *Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings,* 70 Va.L.Rev. 1657 (1984). When ruling on whether to receive State proferred evidence of PTSD a trial judge will have to weigh the benefit of the evidence not only against potential unfair prejudice, but also against the complexity of possibly accompanying issues and against the time required properly to try the expanded case.

*Id.* 109–110, 517 A.2d 741 (emphasis added).

In *Hutton,* the Court further clarified the trial issues which could be properly explicated by the introduction of the rape trauma syndrome into evidence:

> For the foregoing reasons, we hold that the admission of PTSD testimony to prove sexual abuse occurred was inadmissible and clearly error. Testimony by an expert that the alleged victim suffered from PTSD as a result of sexual abuse goes beyond the limits of proper expert expression. Expert testimony describing PTSD or rape trauma syndrome may be admissible, however, when offered for purposes other than simply to establish that the offense occurred. The evidence might be offered, for example, to *show lack of consent or to explain behavior that might be viewed as inconsistent with the happening of the event,* such as a delay in reporting or recantation by the child. *See Taylor,* 552 N.Y.S.2d at 888–90, 552 N.E.2d at 136–38. This case does not fit within any such exception.

*Hutton v. State,* 339 Md. at 504, 663 A.2d 1289 (emphasis added).

Pellucidly, the facts presented in the case *sub judice* are quintessentially the circumstances contemplated by Maryland

authorities which have considered the rape trauma syndrome. Obviously, it strains credulity that one who later claims to have been raped would be compliant during the sexual encounter, fail to immediately report the sexual assault and, most confounding, give her alleged attacker her home telephone number. Unlike *Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988) and *Hutton*, the evidence was neither employed to establish the happening of the criminal event or the victim's credibility, nor was it outside the bounds of the expert's area of expertise, nor did it invade the province of the jury. Finally, as approved by the Court of Appeals in *Hutton*, *Acuna* and *Allewalt*, Dr. Burgess properly relied on material supplied by the court and statements as part of the hypothetical foundation upon which she based her opinion. The court properly denied appellant's motion *in limine* to exclude the testimony of Dr. Burgess.

**JUDGMENTS OF CONVICTION OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY MONTGOMERY COUNTY.**